Harold D. **JONES, as Liquidating Trustee, Plaintiff,**

v.

**TAUBER & BALSER, P.C., et al., Defendants.**

Civil Action No. 1:11–CV–2995–AT.

United States District Court, N.D. Georgia, Atlanta Division.

July 5, 2013.

David James Worley, James M. Evangelista, Atlanta, GA, Jeffrey R. Harris, Stephen G. Lowry, Savannah, GA, Harris Penn Lowry LLP–GA; J. Antonio Del-Campo, DelCampo Weber & Grayson, LLC, Dunwoody, GA, for Plaintiff.

Johannes Stuart Kingma, John L. Bunyan, John Colquitt Rogers, Lindsey Palmer Hettinger, Thomas Alan Cox, Carlock Copeland & Stair, LLP, Atlanta, GA, for Defendant Tauber & Balser, P.C.

Alison M. Ballard, John M. Gross, John K. Rezac, Rachael Lee Zichella, and Todd

Edward Jones, Taylor English Duma LLP, Atlanta, GA, for Defendant Habif, Arogeti & Wynne, LLP and HA & W Holdings, LLC.

Christopher Scott Anulewicz, Malissa Anne Kaufold–Wiggins, Michael J. Bowers, Balch & Bingham LLP, Atlanta, GA, John Colquitt Rogers, Carlock Copeland & Stair, LLP, Atlanta, GA, for Defendants Martin L. Tanenbaum, Richard W. Millman, James M. Welch, Scott A. Rittenberg, Samuel L. Tuck and Howard A. Zandman.

John Colquitt Rogers, Carlock Copeland & Stair, LLP, Atlanta, GA, for Defendant Leslie Balmforth.

Christopher Scott Anulewicz, Malissa Anne Kaufold–Wiggins, Michael J. Bowers, Balch & Bingham LLP, Atlanta, GA, John L. Bunyan, John Colquitt Rogers, Thomas Alan Cox, Carlock Copeland & Stair, LLP, Atlanta, GA, for Defendant Paul D. Dopp.

## *ORDER*

AMY TOTENBERG, District Judge.

*Overview* ................................................................ 168

*Tauber & Balser Defendants' Motion to Withdraw Admission* ...................... 171

 I. Background ........................................................ 171
 A. Factual Background .............................................. 171
 B. Procedural Background ........................................... 174

 II. Analysis ......................................................... 175

*Plaintiff's Omnibus Motion to Compel Defendants' Production of Documents* ........ 176

 I. The Form of Plaintiff's Omnibus Motion ............................... 176

 II. Analysis ......................................................... 177
 A. Allegations that Defendants are Withholding Responsive Non–Privileged Documents ........................................ 177
 B. Allegations that Defendants' Privilege Assertions are Baseless or Inapplicable .................................................. 179
 1. Attorney–Client Privilege and the Crime–Fraud Exception ............. 179
 2. Work Product Doctrine .......................................... 188
 3. Common Interest Privilege ....................................... 189

 C. Plaintiff's Demand to Inspect Computers ................................190

 III. Conclusion .........................................................190

***Plaintiff's Motion to Compel Production of CAMICO Documents*** ....................191

 I. Background ........................................................191
 A. Factual Background ...........................................191
 B. Procedural Background ........................................193

 II. Analysis ..........................................................194
 A. Work Product Doctrine .......................................194
 B. Common Interest Privilege ...................................195
 C. Attorney–Client Privilege and Crime–Fraud Exception....................196

 III. Conclusion .......................................................196

***Plaintiff's Motion for Sanctions*** ................................................196

 I. Introduction .....................................................196

 II. The Form of Plaintiff's Sanctions Motion ..................................196

 III. Background .......................................................197
 A. Discovery During the Adversary Proceedings ...........................197
 B. Discovery in this Court .....................................199

 IV. Analysis .........................................................199
 A. Sanctions Under Rule 37(b)...................................200
 B. Sanctions Under Rule 26(g)...................................201
 C. Appropriate Sanctions ......................................202

***Summary of Rulings*** ...................................................204

## Overview [1]

This matter is before the Court on Plaintiff's two motions to compel discovery [Docs. 88, 89] and one motion for sanctions [Doc. 120] and Defendant Tauber & Balser, P.C., Mark Murovitz, Sheldon Zimmerman, and Paul Dopp's (collectively "Tauber & Balser Defendants") motion to withdraw admissions [Doc. 112].

This case began as an adversary proceeding during the ongoing bankruptcy of Debtor Verso Technologies, Inc. ("Verso"). Verso was a publicly traded company. Verso's public accounting firm, Defendant Tauber & Balser, P.C. ("Tauber & Balser" or "T & B") filed a $468,000 Proof of Claim, seeking to recover a debt Verso allegedly owed it for services Tauber & Balser rendered. Plaintiff, as Liquidating Trustee,[2] objected to this Proof of Claim

**1.** The factual overview and additional factual background provided in this Order are meant for context purposes only and do not constitute actual findings of fact. The Court derives these facts from Plaintiff's First and Second Amended Complaints and the parties' subsequent filings.

**2.** Initially, Darryl S. Laddin served as the Liquidating Trustee in this matter. Subse-

quently, the Beneficiaries Committee appointed Harold D. Jones to serve as Liquidating Trustee with respect to the instant adversary proceeding. Accordingly, on April 12, 2013, Harold D. Jones replaced Darryl S. Laddin. (Doc. 118.) The Court will refer to both Laddin and Jones as Liquidating Trustee or Plaintiff.

and on April 23, 2010, initiated this adversary proceeding alleging that Tauber & Balser committed various acts of fraud related to its audits of Verso's financial statements. (*See generally* Am. Compl., Doc. 9–1.)[3] Plaintiff argues that T & B concealed Verso's dire financial situation in order to prolong the company's life and keep it out of bankruptcy. Consequently, Verso allegedly dug itself into a deeper financial hole while Verso's management continued to draw salaries, bonuses and stock options. T & B allegedly benefited from its course of conduct. Verso was its biggest client, and its engagement with Verso allegedly allowed T & B to market itself as a successful niche accounting practice at a time when T & B was looking for a succession plan for its aging partners.

Plaintiff also alleged that in 2008, T & B transferred substantially all its assets to Defendants Habif Arogeti & Wynn and HA & W Holdings, LLC (collectively, "Habif Defendants" or "Habif") in such a manner as to also transfer T & B's liability to Verso. (Am. Compl. Counts 14–17.) Most relevant to the instant discovery dispute, Plaintiff alleged that, to "isolate T & B's liabilities to Verso and ... render T & B unable to pay to any judgment against it," T & B fraudulently transferred its assets to Habif. (Am. Compl. at ¶ 488.) Plaintiff thus included in his Complaint several

claims against Habif including a fraudulent transfer claim. (*Id.*)

Finally, Plaintiff sued Tauber & Balser's individual shareholders ("Shareholders"), alleging their liability under (1) a theory of piercing the corporate veil and (2) a theory of direct liability for fraud.[4]

The Habif Defendants and the Tauber & Balser Defendants filed motions to dismiss all claims against them. (*See* Docs. 8–1 and 9–2.)[5] Shortly after filing their motions to dismiss, the Defendants joined the Plaintiff in filing a consent motion to withdraw the reference to the Bankruptcy Court of Plaintiff's counts for affirmative relief. (Doc. 1–2.) The Court granted this consent motion and promptly began considering the motions to dismiss.

On June 18, 2012, the Court granted in part and denied in part the Defendants' motions. (Doc. 31.) The Court held that Plaintiff failed to allege sufficient facts to support the extraordinary relief of piercing the corporate veil and thus dismissed all claims against the individual defendants predicated on this theory. (*Id.* at 9–13.) Likewise, the Court dismissed Plaintiff's claims of direct liability for fraud against most of the individual defendants because Plaintiff failed to allege particularized facts

---

**3.** Upon the Court's directive, (Doc. 21), Plaintiff filed a Second Amended Complaint to specifically address the Defendants' in pari delicto defense (Doc. 23). On June 18, 2012, the Court denied the Defendants' motion to dismiss premised on this defense. (Doc. 31.)

**4.** Plaintiff's Second Amended Complaint asserted twenty counts in total. For purposes of the instant discovery motions, the Court only discusses the most relevant counts here.

**5.** One such argument was the in pari delicto defense. In pari delicto is shorthand for the Latin phrase "in pari delicto potior est conditio defendentis," meaning, "in a case of

equal or mutual fault, the position of the defending party is the better one." In Georgia, in pari delicto is an equitable defense based on the policy view that courts should not lend their aid to a wrongdoer, but rather will leave the parties where they are. *Laddin v. Edwards*, 437 F.3d 1145, 1152 (11th Cir. 2006). The Court directed the Plaintiff to file an amended complaint to allege any additional factual allegations that may relate to this defense. (Doc. 21.) Plaintiff did so. (2d A. Compl., Doc. 23.) Defendants filed motions to dismiss this Second Amended Complaint, and the Court's ruling on June 18, 2012 considered both sets of motions to dismiss. (*See* Doc. 31.)

to support such claims. (*Id.* at 15.)[6] However, the Court found that Plaintiff adequately pled direct liability for fraud against Murovitz, Zimmerman, and Dopp (collectively, "Individual Defendants"). Finally, the Court held that Plaintiff's fraudulent transfer claim against the Habif Defendants could go forward because Plaintiff pled sufficient facts to support a transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." (Doc. 31 at 19 (quoting O.C.G.A. § 18-2-74).)

The parties then engaged in several months of additional discovery. Plaintiff served Defendants with a document request on September 19, 2012, requesting, *inter alia*, T & B shareholder meeting notes and documents associated with T & B's insurance coverage. (Rogers Decl., Doc. 104-1, ¶ 11; Evangelista Decl. Ex. 1(1), ("Resp. Pl. 6th Req. Prod.").)[7] Shortly thereafter, in November 2012, Plaintiff served subpoenas to produce documents upon several non-parties including CAMICO Mutual Insurance Company ("CAMICO"), T & B's professional liability insurer, (Doc. 51-4), and three law firms that counseled T & B and Habif on the transaction between them, (Docs. 51-2, 51-3, 51-5).[8] The Defendants moved to quash these subpoenas on November 16, 2012, alleging, *inter alia*, that documents Plaintiff seeks are protected by the attorney-client privilege or work product doctrine. (Docs. 51, 52.)

The Court held a hearing on December 7 and 12, 2012, to address Defendants' motions to quash and related discovery issues. The Court considered: (1) whether Plaintiff produced sufficient evidence to apply the crime-fraud exception justifying the vitiation of the attorney-client privilege as to certain communications; and (2) whether T & B's voluntary production of a privileged memorandum, (Dec. 7, 2012 Hrg. Ex. 4, Doc. 87-4 (the "Sutherland Memo")), constitutes a waiver of the attorney-client privilege as to all communications associated with that memorandum. (*See* Doc. 62.)[9]

After the hearing, the Court made three primary decisions. First, because Plaintiff agreed to exclude documents generated in connection with the instant litigation from the scope of the documents sought in the subpoenas, the Court denied in part Defendants' motions to quash. (*Id.*)[10] Sec-

---

6. The other T & B Defendants, the claims against whom the Court dismissed, included Leslie Balmforth, Martin L. Tanenbaum, Richard W. Millman, James M. Welch, Scott A. Rittenberg, Samuel L. Tuck, and Howard Zandman. (Doc. 31 at 15.)

7. In the underlying bankruptcy proceeding, Plaintiff served Defendants with five sets of document requests. (*See* Rogers Decl., Doc. 104-1, ¶ 10.) This discovery request was Plaintiff's sixth.

8. The three firms are Bryan Cave LLP (formerly Powell Goldstein LLP) ("Bryan Cave"), Sutherland Asbill & Brennan LLP ("Sutherland"), and Taylor English Dumas LLP ("Taylor English").

9. At this hearing, counsel for Plaintiff indicated that he intended to file an "omnibus" motion to compel documents in the coming weeks.

10. The Court directed Defendants to confer and collaborate with Sutherland to produce all documents responsive to Plaintiff's subpoena as modified. (Doc. 62.) The parties resolved their dispute regarding the Taylor English subpoena, subject to the Court's ruling on the crime-fraud exception. (Dec. 12, 2012 Hrg. Tr., Doc. 66, at 62.) And the T & B Defendants subsequently waived the attorney-client privilege that protects documents produced by Bryan Cave LLP. (Doc. 94.) Accordingly, the only remaining issue was whether CAMICO must produce documents in response to the subpoena. The Court considers this issue in its analysis of Plaintiff's Motion to Compel CAMICO's Production of Documents, *infra*.

ond, the Court directed Defendants to confer with the non-parties to provide the remaining subpoenaed documents for *in camera* inspection so the Court could decide the issue of the crime-fraud exception. (*Id.*) Finally, the Court held that Defendants' voluntary production of the Sutherland Memo constituted a waiver of the attorney-client privilege as to associated communications and directed Defendants to produce documents accordingly. (*Id.*)

Shortly thereafter, the parties filed the instant discovery motions. On February 22, 2013, Plaintiff filed: (1) Plaintiff's Omnibus Motion to Compel Discovery ("Omnibus Motion") (Doc. 88); and (2) Plaintiff's Motion to Compel Camico's Production of Documents Responsive to Subpoena ("Motion to Compel CAMICO") (Doc. 89). The T & B Defendants then filed a Motion to Withdraw Admissions. (Doc. 112.) Lastly, Plaintiff filed a Motion for Sanctions. (Doc. 120.) Each of these motions is now ripe for adjudication. The Court begins with Defendants' Motion to Withdraw Admissions.

### Tauber & Balser Defendants' Motion To Withdraw Admissions

The Tauber & Balser Defendants move to withdraw their admission that the 2007 T & B shareholder operating agreements are still in effect. (Doc. 112.) According to T & B, a recently discovered 2008 Amendment to the operating agreement shows that their initial denial was erroneous. As explained below, the Court **GRANTS** the Tauber & Balser Defendants' Motion to Withdraw Admission [Doc. 112].

## I. BACKGROUND

### A. FACTUAL BACKGROUND

Tauber & Balser, P.C. entered into operating agreements with its shareholders on December 20, 2007. (*E.g.*, Omnibus Motion, Evangelista Decl. Ex. 2, Doc. 88–4 at 114 ("2007 Shareholder Agreement").) This agreement defined the rights and obligations of the individual T & B shareholders ("Shareholders") in relation to Tauber & Balser, P.C., a Georgia professional corporation. (*Id.* at 114.) Section 3.06(b) of the 2007 Shareholder Agreement, entitled, "Pre and Post Termination Compensation, Services Rendered to Corporation's Clients," is particularly relevant to this case.

Section 3.06(b) limits the extent to which a Shareholder–Employee can solicit work from T & B clients after termination of his or her employment. Pursuant to this section, each Shareholder–Employee (i.e. the Individual Tauber & Balser Defendants) may continue to offer or solicit professional services to any of T & B's clients with whom the Shareholder has had a material contact within the previous four years. (*Id.* at 121, § 3.06(b).) However, for the five years after termination, the Shareholder must pay T & B 18 percent of the gross fees it collects from such relationships. (*Id.*) Plaintiff argues that according to section 3.06(b), Tauber & Balser, P.C., not the individual Shareholders, owned the Shareholder's goodwill (i.e. "book of business").[11] (*See, e.g.*, Doc. 122 at 10.)

About three months later, on March 14, 2008, T & B and Habif entered into a

---

**11.** "Goodwill is generally understood to represent the value of intangible factors that are expected to translate into greater than normal earning power." *In re Bay Plastics, Inc.*, 187 B.R. 315, 330 n. 24 (Bankr.C.D.Cal.1995). The relevant goodwill here is T & B's "book of business" (i.e. client lists), which appears to be worth upwards of $9 million. (*See* Pl. Notice of Info. Assist In Camera Review ("Jan. 23, 2013 Notice"), Doc. 71, Ex. 8 at 4 (attorney Cohen's notes from telephone conference with Habif tax partner Alan Vaughn, Aug. 28, 2008).)

Letter of Intent ("LOI") evidencing a proposed transaction between the two entities. (Pl. Notice of Info. Assist In Camera Review ("Jan. 23, 2013 Notice"), Doc. 71, Ex. 2 at 3–12.)[12] According to the LOI, certain individual T & B Shareholders would join Habif as equity partners. (*Id.*) On April 9, 2008, however, the T & B Shareholders decided not to go forward with this transaction. (*Id.* Ex. 3 at 3.)

On April 15, 2008, T & B notified its insurer, CAMICO, of a "situation involving [Verso], a public company client." (*Id.* Ex. 4 at 2.) T & B's Chief Operating Officer Leslie M. Balmforth noted that Verso was a "going concern risk, as indicated in [the T & B prepared Verso] 10K report that has not yet been filed." (*Id.*) Balmforth explained that she was concerned about getting paid the $450, 000 outstanding balance on Verso's account.

Verso filed for bankruptcy on April 25, 2008. In a subsequent board meeting, T & B expressed concern about liability to Verso for its own provision of accounting services. (*See* Motion to Compel CAMICO, Evangelista Decl. Ex. 8, Doc. 89–2 at 75–79, 77 (T & B board meeting notes) (noting concern regarding exposure with the Verso engagement related to Generally Accepted Auditing Standards ("GAAS") and Generally Accepted Accounting Principles ("GAAP"))).

The T & B Defendants and Habif resumed discussion about their transaction in June and July 2008. One of the elements of the discussion was how T & B's goodwill would be categorized and contributed to Habif. (Jan. 23, 2013 Notice, Doc. 71, Ex. 5.) The Defendants wanted the book of business to be considered personal goodwill. (*Id.* Ex. 6.) One advantage to characterizing the book of business in this way is that the T & B Shareholders could contribute the goodwill personally to Habif without first receiving a corporate distribution of the goodwill from T & B, which would be an expensive taxable event. (*See id.* Ex. 13 at 1–2.) However, Defendants' counsel understood that at least one reading of the 2007 Shareholder Agreement suggested that the book of business was corporate goodwill. (*Id.* Exs. 6, 7, 10.) In particular, Section 3.06 is similar to a non-compete agreement, and according to Defendants' counsel, "[t]he IRS has said that if the shareholders have a non-compete with the corporation the goodwill is corporate goodwill." (*Id.* at Ex. 6.)[13] It ap-

---

**12.** Out of an abundance of caution, the Court sealed Plaintiff's two Notices of Supplemental Information to Assist In Camera Review, (Docs. 78, 79), as well as the Defendants Omnibus Reply to these filings (Doc. 84) and the transcript from the status conference held on January 31, 2013 to address these filings (Doc. 85). In this Order, the Court refers to information contained in these sealed filings only to the extent such information is not confidential or previously publicly disclosed by one of the parties.

**13.** Section 3.06(b) read as follows:
A Shareholder–Employee who has terminated employment may offer or solicit Professional Services to any person or entity, or any representative of any person or entity, with whom the Shareholder–Employee has had material contact (i.e., dealt with directly, supervised dealings on a case/matter or prospective case/matter, obtained confidential information concerning a specific case/ matter, or had generated fees from) during the four (4) years immediately preceding the date of the Shareholder–Employee's termination. In addition, a Shareholder–Employee who has terminated employment may offer or solicit Professional Services to any person or entity; or any representative of any person or entity; with respect to any case/matter on which the Shareholder–Employee has performed consulting services during the four (4) years immediately preceding the date of the Shareholder–Employee's termination. In the event of such offer or solicitation, the Shareholder–Employee shall remit to the Corporation eighteen percent (18%) of the gross fees collected by Shareholder–Em-

pears, however, that at this time neither the Defendants nor their counsel had a firm grasp on how to categorize T & B's book of business.

Near the end of July, attorneys at Powell Goldstein LLP ("Powell Goldstein") (now Bryan Cave LLP ("Bryan Cave")) and Taylor English, on behalf of T & B, P.C., considered tax implications of the transaction if the goodwill were to be considered corporate goodwill. (*Id.* Ex. 5.) [14] Three alternative structures for the transaction were proposed. (*Id.*) In the first two, T & B, P.C. could contribute its goodwill to Habif in exchange for an interest in Habif.[15] (*Id.*) In the third, however, the contribution of goodwill would come directly from the individual shareholders. (*Id.*) This third option had "significantly greater [tax] risk" because the IRS might view the structure as first a distribution of goodwill by the corporation to its shareholders, which, as mentioned, is a taxable event. (*Id.*)

Evidently, the T & B Defendants sought further counsel on this tax issue with the firm of Sutherland Asbill & Brennan LLP ("Sutherland"). On August 12, 2008, Sutherland drafted a memorandum advising that T & B could "significantly reduce the taxes owed on the sale" if it characterized a portion of the purchase price as professional (i.e. individual) goodwill. (*Id.* Ex. 13.) Sutherland assessed the circumstances and concluded that "[u]nder the facts, it appears the T & B shareholders possess the vast majority of any goodwill to be sold." (*Id.* at 9.) Nonetheless, Sutherland suggested that the "T & B shareholders agree to terminate [Section 3.06(b) of the 2007 Operating Agreement,] the portion of their operating agreement related to the T & B Fee." (*Id.* at 10; *see also id.* at 7.) According to Sutherland, this would help solidify the characterization of T & B's book of business as the personal goodwill of the individual Shareholders.

Negotiations proceeded and in early October, 2008, Sutherland drafted another memorandum, (the "Sutherland Memo"), again addressing the T & B/Habif transaction. (Dec. 7, 2012 Hrg. Ex. 4, Doc. 87–4; *see also* Jan. 23, 2013 Notice, Doc. 71, Ex. 14 (collecting drafts of the Sutherland Memo).) In this memorandum, shared and discussed with lawyers from Powell Goldstein and T & B Shareholder Mark Murovitz, Sutherland reiterated a number of factors it believed suggested the absence (or near absence) of corporate goodwill in T & B. (*Id.* at 7.) Sutherland again recognized Section 3.06(b) of the 2007 Shareholder Operating Agreement. (*See id.* at 10.) However, now Sutherland advised that Section 3.06(b) "is not a covenant not to compete, [which normally would indicate that the goodwill adheres to the company,] and there is no explicit covenant not to compete in the T & B agreements." (*Id.*) Instead, Sutherland construed Section 3.06(b) as a "deterrent to

---

ployee, or any entities for which Shareholder–Employee works, for such clients or on such consulting cases/matter during the five (5) years following the Shareholder–Employee's termination. The Shareholder–Employee shall remit such payments to the Corporation within thirty (30) days of the receipt of such gross fees from such clients by the Shareholder–Employee or the entity for which the Shareholder–Employee performed the Professional Services for which the fees are paid.

14. This memorandum was drafted by Jason Greene, a tax lawyer at the firm of Taylor English.

15. Pursuant to Section 721 of the Internal Revenue Code, a contribution of property to a partnership in exchange for an interest in the partnership is not a taxable event. *See* 26 U.S.C. § 721 (recognizing that such a contribution is not recognized as a gain or loss).

such competition and recognition of personal goodwill." (*Id.*)

In any case, the T & B Defendants decided to eliminate the post-termination compensation provision (Section 3.06(b)) and revise the 2007 Shareholder Agreement. Accordingly, on October 31, 2008, T & B and the individual Shareholders executed the First Amended and Restated Shareholder Operating Agreement ("2008 Amended Agreement"). (*E.g.*, Mot. Withdraw Exs. G, H, I.) Among other changes, the 2008 Amended Agreement eliminated Section 3.06(b). This amendment purported to be retroactively effective as of February 1, 2007. (*Id.*)

The T & B/Habif transaction closed the next day. (*See* Mot. Withdraw Ex. J ("Index of Closing Documents"), Doc. 112–10.) As part of the transaction, the individual Shareholders entered into the Goodwill Contribution and Assignment Agreements, signed on October 31, 2008 and effective November 1, 2008. (*See, e.g.*, Dec. 7, 2012 Hrg. Ex. 1, Doc. 87–1 ("Zimmerman's Goodwill Contribution Agreement"); *see also* Pl. Omnibus Mot. Compel ("Omnibus Mot."), Evangelista Decl. Ex. 17, Doc. 88–6 at 123–133 ("Draft Goodwill Contribution Agreement").) [16]

On or about January 15, 2009, Bryan Cave (formerly Powell Goldstein) provided T & B with a CD containing executed copies of closing documents in connection with T & B/Habif transaction. (Index of Closing Documents, Doc. 112–10.) The 2008 Amended Agreement is not listed among the included documents. (*See id.*)

### B. Procedural Background

About three months after the Court ruled on Defendants' motion to dismiss, Plaintiff served requests for admission. (*See* Doc. 49; Mot. Withdraw Admissions, Doc. 112, Exs. K, L, M, N (collectively, "Responses to RFA").) Plaintiff requested that the T & B Defendants admit or deny that "there are no documents reflecting the termination or voiding of all or any part of the Tauber & Balser, P.C. Shareholder Operating Agreement entered into on December 20, 2007 by each of the Tauber Shareholders." (Mot. Withdraw Admissions, Doc. 112, Exs. K, L, M, N.).[17] Each T & B Defendant admitted this statement. (*Id.*)

According to the T & B Defendants, they did not recall the 2008 amendments at this time, "as they never received copies." (Mot. Withdraw Admissions, Doc. 112 at 2.) The T & B Defendants admit, however, that they had in their records an "unsigned, electronic copy of the text" of the 2008 Amended Shareholder Agreement. According to the T & B Defendants, this document "turned up in the

---

**16.** Plaintiff asserts, without any citation to the record, that an "August 13, 2008 email from Jason Greene of Taylor English to Jerold Cohen at Sutherland [and others]" attached a draft Goodwill Contribution Agreement. (Doc. 122 at 12.) Plaintiff asserts that this draft Goodwill Contribution Agreement includes, as a condition of closing, a requirement that T & B Shareholders first terminate the 2007 Shareholder Operating Agreement "to eliminate the post-termination compensation provision," (i.e. Section 3.06(b)). The Court located the email and attachment that Plaintiff appears to be referring to. (Omnibus Motion, Evangelista Decl. Ex. 17, Doc.

88–6 at 123–133.) The draft Goodwill Contribution Agreement lists several "closing deliverables" including proof that the 2007 Shareholder Operating Agreement has been terminated. (*Id.* at 126.) There is no language in this draft Goodwill Contribution Agreement that mentions "eliminate[ing] the post-termination compensation provision." (*See id.*)

**17.** The relevant request is Number 11 of the request served on T & B (Ex. K) and Number 2 of the requests served on the Individual T & B Defendants (Exs. L, M, N).

Tauber & Balser, P.C.'s records when the Tauber Defendants were going over their document production again in response to the Court's December 13, 2012 Order." (Mot. Withdraw Admissions, Doc. 112 at 2 n.1.)

The T & B Defendants suggest that Defense counsel first saw the 2008 Amended Agreement when Bryan Cave produced its file in response to Plaintiff's subpoena of Bryan Cave. (*Id.* at 3.) Plaintiff received a copy of the 2008 Agreement with the non-privileged portion of the Bryan Cave paper file on January 22, 2013. (*Id.* Ex. F ("Rogers Decl."), Doc. 112–6 ¶ 4.) Defense counsel then promptly served Plaintiff with an amended response to Plaintiff's request for admission. (*Id.* Ex. F ¶ 5.)

Over two months later, on April 5, 2013, the T & B Defendants moved to withdraw the admission that "there are no documents reflecting the termination or voiding of all or any part of the [2007 Shareholder Agreement]." (Mot. Withdraw Admissions, Doc. 112.)

## II. ANALYSIS

■ The Court may "permit withdrawal or amendment [of an admission] if it would promote the presentation of the merits of the action and if the [C]ourt is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Fed.R.Civ.P. 36(b). Thus, on ruling on the T & B Defendants' Motion to Withdraw Admissions, the Court considers only (1) whether doing so would promote the presentation of the merits and (2) whether prejudice would result. *See Perez v. Miami–Dade Cnty.,* 297 F.3d 1255, 1265 (11th Cir.2002) ("We hold, therefore, that a district court abuses its discretion under Rule 36(b) in denying a motion to withdraw or amend admissions when it applies some other criterion beyond the two-part test. . . .").

■ As to the second element, the prejudice contemplated by this rule "relates to the difficulty a party may face in proving its case, e.g., caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions." *Smith v. First Nat. Bank of Atlanta,* 837 F.2d 1575, 1578 (11th Cir. 1988).

■ Both criteria weigh in favor of granting the motion to withdraw. First, allowing the withdrawal aligns the record to reality, and thus provides a more accurate basis upon which the Court can reach the merits of Plaintiff's case. Second, the withdrawal of the admissions does not prejudice Plaintiff in any material way. As the T & B Defendants have noted, Plaintiff has not yet taken depositions and discovery is still ongoing.

Plaintiff nonetheless objects to the T & B Defendants' withdrawal of the admission on several grounds. First, Plaintiff argues that allowing the withdrawal at this point would "prevent[ ] Plaintiff from demonstrating the contrast between the two positions," presumably referring to the T & B Defendants decision to characterize the goodwill as either corporate or personal. (Doc. 122 at 2.) The Court sees no reason why Plaintiff cannot demonstrate this contrast with a more complete and accurate record.

Second, Plaintiff asserts that the T & B Defendants' erroneous admission has delayed Plaintiff's efforts to uncover facts about the alleged fraudulent transfer. (*See* Doc. 122 at 19.) This assertion is valid but misplaced. Indeed, the Court has substantial concerns about the Defendants' failure to adequately respond to discovery requests, especially in light of court orders requiring such. However, these concerns are more appropriately ad-

dressed in the context of Plaintiff's Motion for Sanctions. Here, the Court is limited to the two criteria of Rule 36(b). Although the T & B Defendants significantly delayed in accurately responding to Plaintiff's request for admission, Plaintiff has not demonstrated how allowing the withdrawal at this time will ultimately make it more difficult for him to prove his case—the type of prejudice contemplated by Rule 36(b). *See Smith*, 837 F.2d at 1578. Absent such prejudice, the Court sees no reason to deny the T & B Defendants' Motion to Withdraw.

Accordingly, the Court **GRANTS** the Tauber & Balser Defendants Motion to Withdraw Admission [Doc. 112].

### *Plaintiff's Omnibus Motion to Compel Defendants' Production of Documents*

On February 22, 2013, Plaintiff filed his "Omnibus Motion to Compel Discovery" ("Omnibus Motion"). (Doc. 88.) The Plaintiff makes three requests. First, Plaintiff appears to suggest that the Defendants are withholding responsive, non-privileged documents and thus requests an Order compelling the production of such documents. Second, Plaintiff argues that Defendants' assertions of the attorney-client privilege or work product protection are either waived or inapplicable as to documents created prior to August 25, 2009, and thus the Court should compel the production of such documents. Finally, Plaintiff seeks an Order granting him broad access to the Defendants' computers and servers. The Court considers each of Plaintiff's requests in turn, but first addresses deficiencies in the form of Plaintiff's Omnibus Motion.

### I. THE FORM OF PLAINTIFF'S OMNIBUS MOTION

As an initial matter, Plaintiff's Omnibus Motion fails to comply with, or abuses, the Court's local rules regarding the proper form for such motions. *See* LR 5.1C, NDGa; LR 7.1D, NDGa; LR 37.1A, NDGa. For example, Plaintiff's motion does not conform to Local Rule 37.1A. Pursuant to Rule 37.1A, a motion to compel must "be arranged so that the objection, grounds, authority, and supporting reasons follow the verbatim statement of each specific disclosure, interrogatory, deposition question, request for designation of deponent, or request for inspection to which an objection is raised." LR 37.1A, NDGa. In contrast, Plaintiff, provides a lengthy narrative, full of factual assertions without record citations, disjointed arguments, and conclusions that beg the essential questions in this case.[18] The Court could deny Plaintiff's motion for this reason alone.

Plaintiff also skirts the local rules to ensure that his lengthy description of the "relevant" facts in this case fit within the page limitations set by the Court. For example, substantive text must be double-spaced. LR 5.1C(2), NDGa. Parties may however single-space the text in a footnote. LR 5.1C. Generally, footnotes are reserved for nonessential material. Here, however, Plaintiff riddles his memorandum of law with single-spaced footnotes containing substantive arguments to support his motion. Plaintiff likewise relies on several pages of single-spaced bulleted lists. Although technically consistent with the local rules, Plaintiff's memorandum of law

---

**18.** To be fair, Plaintiff does provide a chart listing "classes of documents requested but not produced." (*See* Pl. Omnibus Mot. Compel, Evangelista Decl. Ex. 1, Doc. 88–2 at 12–28.) This chart lists Plaintiff's request and Defendants' response but does not tie each discovery objection to Plaintiff's "discussion of the reasons assigned as supporting the motion." LR 37.1A(5).

is inconsistent with the spirit of brevity and concision promoted by the rules.

In addition, Plaintiff incorporated by reference the factual assertions made in six separate filings but failed to provide pinpoint citations to direct the Court to the specific applicable portions of these filings. (*See, e.g.,* Doc. 88–1 at 6 n.3.) Although Fed.R.Civ.P. 10(c) allows for the incorporation by reference in a motion of a statement made in pleading, this Rule is not an invitation to incorporate by reference entire briefs without any indication as to what specific portions are to be adopted. Technically Rule 10(c) only allows for the adoption by reference of statements made in *pleadings.* Fed.R.Civ.P. 10(c). A motion is not a pleading. *See* Fed.R.Civ.P. 7(a) (listing "pleadings" including complaints and answers); *Lowery v. Hoffman,* 188 F.R.D. 651, 653 (M.D.Ala.1999) (noting that motions, briefs or memoranda, and objections are not pleadings) (citing 2 James W. Moore, et al., Moore's Federal Practice § 12.37[2] (3d ed. 1999)).

In addition, Plaintiff's blanket incorporation by reference puts the onus on the Court (and opposing party) to slog through Plaintiff's voluminous material to glean support for Plaintiff's argument. This method of adoption by reference is improper. *See, e.g., Muhammad v. Bethel–Muhammad,* No. 11–0690–WS–B, 2012 WL 1854315, at *3 n. 5 (S.D.Ala. May 21, 2012) (stating that incorporation of entire pleadings into a separate filing is legally impermissible); *U.S. Fid. & Guarantee Co. v. U.S. Sports Specialty Ass'n,* No. 07–CV–996 TS, 2012 WL 2403530, at *1 (D.Utah June 25, 2012) (recognizing that when adopting by reference, "[t]he later pleading must adopt specific portions or all of the earlier pleading with a degree of clarity which enables the responding party to ascertain the nature and extent of the incorporation" (quotation marks omitted)

(quoting *Gen. Accident Ins. Co. of Am. v. Fid. & Deposit Co. of Md.,* 598 F.Supp. 1223, 1229 (E.D.Pa.1984))). Neither the Court, nor the Defendants have a duty to scour Plaintiff's other filings to discern what he believe specifically supports his arguments here.

Plaintiff's disregard for both the letter and spirit of the local rules is not merely a technical point. As the Habif Defendants recognize, "[t]he failure of Plaintiff's Motion and supporting brief to comply with the local rules of this Court renders the requested relief and the arguments asserted by Plaintiff foggy and confusing." (Doc. 103 at 1; *see also* Doc. 104 at 3 ("Local Rule 37.1's mandate allows the parties and the Court to determine precisely what documents Plaintiff has requested, whether the document requests and objections are proper, and exactly what documents properly respond to the requests.").)

Although the Court could rightly disregard the material incorporated by reference in Plaintiff's brief or squeezed into footnotes throughout, the Court instead cursorily reviewed this material in an effort to reach the merits of Plaintiff's motions. However, the Court's primary focus in analyzing Plaintiff's Omnibus Motion is the text and citations in the body of his supporting brief. To the extent Plaintiff's argument relies on other material, the Court might not have considered it.

## II. ANALYSIS

### A. Allegation that Defendants are Withholding Responsive, Non-Privileged Documents

 Plaintiff suggests in his Omnibus Motion that Defendants are withholding responsive, non-privileged documents. (*See* Doc. 88–1 at 18–19.) Defendants aver that no such responsive, non-privileged

documents exist. (Doc. 103 at 7–8; Doc. 104 at 8.) The Court obviously cannot compel Defendants to produce documents that do not exist. However, below is a non-exhaustive list of several documents or categories of documents that appear likely to exist, considering the evidence in the record.[19] Defendants face serious sanctions if in fact such non-privileged documents exist and they have knowingly failed to produce them.

(1) T & B's Audit Work Papers Associated with the Verso Engagement: The Public Company Accounting Oversight Board ("PCAOB") requires auditors to maintain a written record of the basis of their conclusions. *See* PCAOB, Auditing Standard No. 3, § 2, *available at* http://pcaobus.org/Standards/Auditing/Pages//Auditing_Standard_3.aspx (last visited May 27, 2013). This record is known as an auditor's documentation or "work papers." *Id.* Plaintiff requested T & B's documentation associated with the Verso engagement. (*See* Evangalista Decl. Ex. 1(a) ("Def. Resp. Pl. 1st Req. Prod.") Nos. 1–4.) Presumably, such documentation should include T & B's 2007 going concern analysis of Verso and Verso's associated client-prepared budget for that year. (*See* Evangelista Decl. Ex. 14 (noting that T & B's accountant's report of Verso filed on April 15, 2008 contained a going concern emphasis paragraph).) According to Plaintiff, no Defendant has produced these documents. (Doc. 88–1 at 12 n.12.)

(2) T & B Management, Board, or Shareholder Meeting Documents: Plaintiff has requested documents associated with T & B management, board, or shareholder meetings. (*See, e.g.,* Evangelista Decl. Ex. 1(f) ("Def. Resp. Pl. 4th Req. Prod.") Nos. 7, 22, 27.) According to Plaintiff, Defendants have failed to identify or produce documents associated with such meetings held in 2006, 2007 and 2008. In particular, recently produced time records show that T & B held management, board or shareholder meetings on 33 separate days in 2008. (Evangelista Decl. ¶ 12.) However, for 2008, Defendants produced only one set of board minutes (for a May 14, 2008 meeting) and three sets of shareholder meeting minutes. And Defendants produced only 103 pages of associated documents (such as agendas, notes and calendar entries) for all three years worth of meetings. (Doc. 114 at 5; *see also* Doc. 88–1 at 10, 13, n.14.) It is hard to imagine that a firm such as T & B would keep such a thin record of its meetings.[20]

(3) Emails Regarding the Verso Engagement and T & B/Habif Transaction: Plaintiff requested emails related to T & B's Verso Engagement. (*See, e.g.,* Def. Resp. Pl. 1st Req. Prod. No. 1.) According to Defendant's Counsel, T & B's billing records show that 29 individual T & B partners or employees worked almost 5,000 hours on the Verso engagement. (Worley Decl., Doc. 116, ¶ 27.) For example, Barbara Catherall, audit manager on the Verso engagement, billed nearly 1,300 hours. Defendants, however, produced emails from only the computer of one T & B partner, Sheldon Zimmerman. (*Id.* ¶ 26.) Considering the hours billed on the Verso project, it is reasonable to assume that more emails exist. Likewise, Plaintiff

**19.** Plaintiff failed to distinguish clearly which sets of documents are withheld based on privilege or some other protection from those he asserts Defendants' wrongly claim are nonexistent. To the extent the documents listed here are in fact withheld on the basis of privilege or other valid protection, Defendants

have no duty to produce them except as required by law or directed by the Court.

**20.** Nonetheless, T & B avers that its board generally did not keep meeting minutes. (Evangelista Decl. Ex. 1(1), ("Def. Resp. 6th Req. Prod."), No. 5.)

requested emails discussing the T & B/HA & W transaction. (*See, e.g.,* Evangelista Decl. Ex. 1(c), ("Resp. Pl. 3d Req. Prod.") Nos. 3–5; Evangelista Decl. Ex. 1(1), ("Def. Resp. 6th Req. Prod."), Nos. 23.) According to Plaintiff's Counsel, T & B has produced only seven such emails and HA & W has produced only 42. (*See* Worley Decl., Doc. 116, ¶ 15; *see also* Doc. 114 at 4.)

(4) T & B's Due Diligence Material: Plaintiff's broad requests for documents related to the T & B/HA & W transaction naturally encompass T & B's due diligence materials. (*See, e.g.,* Resp. Pl. 3d Req. Prod. Nos. 2–3.) T & B produced several responsive documents. (Rogers Decl., Doc. 104–1, ¶ 13.) Included in T & B's responsive set of documents are due diligence lists, which themselves reference documents that, according to Plaintiff, Defendants have not produced. (*See* Rogers Decl. Ex., Doc. 105–4, at 63–69; Doc. 114 at 5.)

Although the Court cannot compel Defendants to produce documents that do not exist, the Court will not allow Defendants to collectively withhold documents merely because Plaintiff requested such documents from the party who does not technically possess such document, particularly where the Defendants have shared documents and the T & B shareholders have now joined Habif. Indeed, the Court has already stated that at this point in litigation, when all the Defendants are coordinating discovery, it does not matter to which defendant Plaintiff has directed his document requests. (Dec. 12, 2013 Hrg. Tr., Doc. 66, at 82–83 ("I don't care who owns it at this point. Whoever has them needs to produce them.").) In sum, it would be inexcusable for Defendants to play "hide the ball" in handling their discovery. It is clear that the T & B Defendants and the Habif Defendants have coordinated their respective discovery responses so as to preserve their position that T & B and Habif are separate entities. (*See* Evangelista Decl. ¶ 7, Ex. 6.) Such conduct is not inherently inappropriate or in violation of the federal rules of discovery. However, at this point in litigation, if responsive, non-privileged documents exist, they must be produced regardless of who possesses them.

To be clear, all Defendants are **DIRECTED** to produce all non-privileged documents responsive to each of Plaintiff's discovery requests and subpoenas as if each set of discovery requests and each subpoena were served on each Defendant. Defendants have a grace period of fifteen (15) days from the date of this Order to produce such documents, after which, the revelation or disclosure of such documents in any Defendants' possession will warrant sanctions.

On a final note, to the extent Plaintiff continues to seek documents from Bryan Cave, T & B's counsel on the T & B/Habif transaction, such attempt is now moot. Bryan Cave avers that it has produced to T & B all "hard-copy client files," "hard-copy non-client files," and "electronic client files" associated with its representation of T & B related to the T & B/Habif transaction. (Doc. 96 at 2.) Thus, according to Bryan Cave, "Bryan Cave now has no responsive documents in its possession, custody or control." (*Id.*) Pursuant to this Order, however, Defendant T & B must produce, to the extent it has not already done so, responsive, non-privileged documents to Plaintiff as if Plaintiff's subpoena to Bryan Cave was directed at T & B.

**B. Allegation that Defendants' Privilege Assertions are Baseless or Inapplicable**

*1. Attorney–Client Privilege and the Crime–Fraud Exception*

Plaintiff lodges three primary arguments for why the attorney-client privilege

does not apply to any documents created on or before August 25, 2009, the date Plaintiff's counsel first contacted the T & B Defendants' counsel about Plaintiff's potential claim against them. First, Plaintiff asserts that Defendants have failed to provide a complete privilege log to Plaintiff. Defendants have since produced a more detailed privilege log that appears to moot this argument. (*See* T & B Defs. Resp. Pl. Mot. Compel Ex. O, Docs. 104–12 ("T & B Privilege Log"); Habif Defs. Resp. Pl. Mot. Compel. Ex. 2, Doc. 103–2 ("Habif Privilege Log")[21].) *See* Fed.R.Civ.P. 26(b)(5)(A) (requiring that a party withholding information and claiming it is privileged or protected must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim"); Fed.R.Civ.P. 45(d)(2)(A) (similarly requiring a sufficiently detailed description of the nature of the withheld documents, communications, or tangible things).

Second, Plaintiff argues that the T & B Defendants and Habif have selectively produced and waived clearly privileged information regarding the transfer of assets from T & B to Habif. Plaintiff appears to be referencing T & B's waiver of the attorney-client privilege as to communications related to the Sutherland Memo. The Court has already ruled that the voluntary production of the Sutherland Memo constitutes a waiver of the attorney-client privilege as to associated communications. Plaintiff failed to provide any support for widening the application of this waiver.[22]

Finally, Plaintiff argues that the crime-fraud exception applies to vitiate Defendants' attorney-client privilege. (Doc. 88 at 1; *see also* Pl. Mot. Compel CAMICO's Production of Docs. Resp. Subpoena ("Mot. Compel CAMICO"), Evangelista Decl. ¶ 8.)

▆▆▆ "The crime-fraud exception does not require proof of the existence of a crime or fraud to overcome the claim that a communication is privileged. Rather, its applicability depends upon whether a prima facie case has been made that the communication was made in furtherance of

---

**21.** Plaintiff's counsel avers that Habif produced a revised privileged log on May 6, 2013 adding approximately 215 new entries. (Pl. Reply Habif Def. Resp. Pl. Mot. Sanctions, Evangelista Decl. ¶ 8.)

**22.** To be clear, the waiver of privilege associated with the production of the Sutherland Memo does not apply to any assertion of privilege held by the Habif Defendants. As the Habif Defendants rightly point out, the *T & B Defendants* cannot waive the privilege as to communications between the Habif Defendants and the Habif Defendants' separate counsel as to the same subject matter. *See Lazar v. Mauney*, 192 F.R.D. 324, 329 (N.D.Ga.2000) ("Only the client may waive the privilege.") (citing *Osborn v. Georgia*, 233 Ga.App. 257, 504 S.E.2d 74, 77 (1998)); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1191 (D.S.C.1974) ("Notwithstanding a community of interest among the associates, a subject matter waiver of a privileged communication, discussing a particular subject between one client and its attorney does not constitute a subject matter waiver of other privileged communications discussing the same subject between a different client and its attorney. Each client has its own attorney-client privilege and only the particular client can waive the privilege."); *see also* Fed.R.Evid. 502(a) (stating that a disclosure in a federal proceeding that waives the privilege extends to undisclosed communications concerning the same subject matter only if the waiver is intentional and the other communications "ought in fairness to be considered together"); *accord In re Teleglobe Communications Corp.*, 493 F.3d 345, 379–80 (3d Cir. 2007) (holding that under Delaware law, one co-client cannot waive the privilege with respect to another co-client's communications with their shared lawyer).

an illegal or fraudulent activity." *Rose v. Commercial Factors of Atlanta, Inc.,* 262 Ga.App. 528, 586 S.E.2d 41, 42 (2003) (internal citations omitted). To meet his burden of making this prima facie showing, Plaintiff need only present prima facie evidence that the charge of fraud has "some foundation in fact." *Atlanta Coca–Cola Bottling Co. v. Goss,* 50 Ga.App. 637, 179 S.E. 420, 421 (1935) (quoting *Clark v. U.S.,* 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933)). "Prima facie evidence is that which, on its face, is good and sufficient to establish a given fact, though it can ultimately be rebutted or contradicted." *Rose v. Commercial Factors of Atlanta, Inc.,* 262 Ga.App. 528, 586 S.E.2d 41, 43 (2003). The Court does not assess the credibility of evidence when analyzing whether the crime-fraud exception applies. *See id.*

Although Georgia law governs the question of whether the crime-fraud exception applies here, *see In re Fink,* 876 F.2d 84, 85 (11th Cir.1989), federal law provides a two-prong test that is "very similar to Georgia law and more instructive in how application of the exception must be justified by the moving party." *Tindall v. H & S Homes, LLC, et al.,* 757 F.Supp.2d 1339, 1351 (M.D.Ga.2011) (citing *United States v. Cleckler,* 265 Fed.Appx. 850, 853 (11th Cir. 2008)); *see also McDonald v. H & S Homes, LLC,* No. 5:08–cv–298(CAR), 2009 WL 4251174, at *5–6 (M.D.Ga. Nov. 23, 2009).

First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

*United States v. Cleckler,* 265 Fed.Appx. 850, 853 (11th Cir.2008) (citations omitted).

■ "The first prong is satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *Id.* (quoting *In re Grand Jury Investigation (Schroeder),* 842 F.2d 1223, 1226–27 (11th Cir.1987)). "The second prong is satisfied by a showing that the communication is related to the criminal or fraudulent activity established under the first prong." *Id.* The Court considers both elements of the crime-fraud exception in turn.

### a. Prima Facie Showing

Plaintiff's assertion of the crime-fraud exception appears to arise out of his claim that T & B and Habif violated the Georgia Uniform Fraudulent Transfers Act, O.C.G.A. § 18–2–74 ("UFTA"), by fraudulently transferring the corporate goodwill of T & B, P.C. (T & B's client lists known as the "book of business") to Habif.[23] (*See*

---

**23.** In Plaintiff's Omnibus Motion, he fails to clearly argue why the crime-fraud exception should apply at all. To the extent Plaintiff has any other theory of application of the crime-fraud exception, (e.g., one based on Plaintiff's allegations of fraud in Counts 1–3, 5–8, and 10–13 of his Second Amended Complaint), the Court could not discern it. In addition, Plaintiff suggests, without hardly any support, that the T & B Defendants and Habif Defendants "joint and deliberate strate-

gy of selective disclosure appears to be an affirmative attempt to mislead Plaintiff and the Court as to their liability." (Doc. 88–1 at 20–21.) Plaintiff asserts that this conduct "itself would support application of the crime-fraud exception" but fails to explain precisely why this would be so. (*See id.* at 21.) Rather, Plaintiff refers the Court to his arguments in a series of other filings. Based upon a comprehensive review of these filings, the Court can discern only one viable theory of

Doc. 88–1 at 21.) A threshold inquiry under UFTA is whether a particular event is considered a "transfer." " 'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset...." O.C.G.A. § 18–2–71(12). An asset, in turn, generally includes any property of a debtor. O.C.G.A. § 18–2–71(2).[24] And UFTA broadly defines "property" as "anything that may be subject of ownership." O.C.G.A. § 18–2–71(10). The question here, therefore, is whether "goodwill" is considered property the fraudulent transfer of which violates UFTA.

Generally, goodwill is a term used to describe the value that inheres in an ongoing business typically as a result of a constant or habitual customer base. *See Smith v. Davidson*, 198 Ga. 231, 31 S.E.2d 477, 479 (1944).

> "[Goodwill]" as the term is used when speaking of the [goodwill] of a business, is not corporeal property; but it has been often defined as advantage or benefit acquired by an establishment, beyond the mere value of property employed in a business, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or for other reasons.

*Smith v. Davidson*, 198 Ga. 231, 31 S.E.2d 477, 479 (1944); *accord Howard v. United States*, 448 Fed.Appx. 752, 753 (9th Cir. 2011) ("Goodwill 'is the sum total of those imponderable qualities which attract the custom of a business,—what brings patronage to the business.'" (quoting *Grace Brothers v. Comm'r*, 173 F.2d 170, 175–76 (9th Cir.1949))). Goodwill may be personal, adhering to an individual, or "enterprise," adhering to a business. *See Miller v. Miller*, 288 Ga. 274, 705 S.E.2d 839, 844 (2010).

Neither the parties nor the Court were able to identify a Georgia case addressing whether the transfer of goodwill, an intangible thing, may constitute a violation of UFTA. However, "in light of the dearth of Georgia decisions construing the provisions of the Georgia UFTA, [Georgia courts] look to the decisions of other jurisdictions for guidance." *Truelove v. Buckley*, 318 Ga.App. 207, 733 S.E.2d 499, 501 (2012). This Court will therefore do the same.

Several courts have held that the transfer of enterprise goodwill, if done fraudulently, would violate UFTA. *See, e.g., Airflow Houston, Inc. v. Theriot*, 849 S.W.2d 928, 933 (Tex.Ct.App.1993); *Quinn v. Elite Custom Transporters & Motorcoaches, LLC*, No. 10–118(MJD/AJB), 2011 WL 1869391, at *5 (D.Minn. May 16, 2011) (collecting cases); *see also Miller v. Miller*, 288 Ga. 274, 705 S.E.2d 839, 844 (2010) (recognizing that enterprise goodwill is generally viewed as property capable of transfer in business transactions); *Constitution Realty, LLC v. Oltarsh, et al.*, 309 A.D.2d 714, 714, 766 N.Y.S.2d 425

---

the crime-fraud exception, the theory described above. Likewise, Plaintiff has failed to show how Defendants' purported coordination in this matter justifies vitiating Defendants' assertions of the work product doctrine. (*See* Doc. 88–1 at 22 (suggesting that the coordinated discovery responses prevent Defendants from asserting the work product doctrine as to documents created after August 25, 2009)).

**24.** Assets do not include

(A) Property to the extent it is encumbered by a valid lien;
(B) Property to the extent it is generally exempt under nonbankruptcy law; or
(c) An interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.

O.C.G.A. § 18–2–71(2). None of these exceptions apply here.

(N.Y.App.Div.2003) (applying the Uniform Fraudulent Conveyance Act to the transfer of goodwill). Such courts have recognized that, "[a]lthough an intangible, [goodwill] is an integral part of the business, the same as the physical assets." *Airflow Houston,* 849 S.W.2d at 933.[25] In addition, as one court has recognized, "[t]he drafters of UFTA intended the definition of property to include 'real and personal property whether tangible or intangible.'" *State ex rel. Indus. Com'n of Ariz. v. Wright,* 202 Ariz. 255, 43 P.3d 203, 206 (Ct.App.2002) (quoting Unif. Fraudulent Transfer Act, 7A Uniform Laws Annotated statutory notes, § 1 cmt. 10. (1984)).

Defendants do not appear to dispute that the transfer of enterprise goodwill is a transfer subject to the provisions of UFTA. (*See* Habif Resp. June 12, 2013 Ord., Doc. 130 at 4 ("[C]ases [from other jurisdictions] indicate that a transfer of enterprise goodwill may constitute a fraudulent conveyance."); Tauber Defs. Resp. Ord. June 12, Doc. 131, at 5 ("This does not mean that intangible goodwill cannot be fraudulently transferred in some circumstances or that it lacks any value.").) Instead the Defendants argue the transfer of goodwill in *this* case simply could not have violated UFTA. The Defendants make two arguments to support this.

▄▄▄ First, the Defendants argue that, although enterprise goodwill may constitute a fraudulent conveyance, personal goodwill does not. Even if this were so, "a determination of [goodwill] is a question of fact and not of law." *Miller,* 705 S.E.2d at 843. Here, Plaintiff has put forth prima facie evidence that the goodwill involved in the T & B/Habif transaction was in fact T & B, P.C.'s enterprise goodwill. (Motion

to Compel CAMICO, Evangelista Decl. Ex. 8, Doc. 89–2 Exs. 6, 7, 10 (showing that the Defendants' counsel understood the 2007 Shareholder Agreement might be construed as suggesting the existence of enterprise goodwill)). Whether the Defendants ultimately rebut this evidence is irrelevant for purposes of the crime-fraud exception. *See Rose,* 586 S.E.2d at 42.

▄▄▄ Second, the T & B Defendants argue that the alleged goodwill here "has no value to any creditor" and thus cannot logically be the subject of a fraudulent transfer. (Tauber Defs. Resp. Ord. June 12, Doc. 131, at 4.) This argument certainly has superficial appeal. Indeed, at least one court has recognized that intangible assets like goodwill "may have no liquidation value or going concern value" and thus "cannot be sold to satisfy a creditor's claim." *Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.),* 187 B.R. 315, 330 (Bankr.C.D.Cal.1995). However, Plaintiff has produced evidence that the goodwill transferred here had substantial value. (*See* Jan. 23, 2013 Notice, Doc. 71, Ex. 8 at 4 (attorney Cohen's notes from telephone conference with Habif tax partner Alan Vaughn, Aug. 28, 2008).) Accordingly, the Court rejects the Defendants' arguments that the alleged transfer of goodwill from T & B, P.C. to Habif cannot as a matter of law under these circumstances constitute a fraudulent transfer under UFTA. The Court next turns to whether Plaintiff has made a prima facie showing that the transfer of goodwill here was fraudulent.

According to UFTA, a debtor's transfer is fraudulent as to a creditor if the debtor made the transfer under one of two cir-

**25.** Georgia law recognizes in other contexts the value of customer lists. *See, e.g., Hilb, Rogal & Hamilton Co. of Atlanta, Inc. v. Holley,* 284 Ga.App. 591, 644 S.E.2d 862, 867 (2007) ("Tangible customer lists are the property of the employer and may warrant protection as trade secrets.").

cumstances: (1) "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor" ("intentional fraud"); or "(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation" ("constructive fraud"). O.C.G.A. § 18–2–74(a); *see, e.g. McDonald v. H & S Homes, LLC,* No. 5:08–cv–298(CAR), 2009 WL 4251174, at *3–5 (M.D.Ga. Nov. 23, 2009). Constructive fraud only leads to a fraudulent transfer if the debtor is in a position to incur expenses or debt in excess of the debtor's ability to pay them. O.C.G.A. § 18–2–74(a)(2)(A)–(B).

Plaintiff is only pursuing a claim of intentional fraud. (*See* 2d Am. Compl. ¶¶ 486–490; *see also* Doc. 31 at 19.)[26] Georgia law provides a non-exhaustive list of factors to consider when assessing whether a defendant had the requisite intent to defraud under this theory of liability. O.C.G.A. § 18–2–74(b). To establish a prima facie case of intentional fraud, the plaintiff need not present evidence on each factor. *See McDonald,* 2009 WL 4251174, at *5 (finding prima facie showing that transactions were fraudulent in intent and effect based on four of the eleven factors listed in O.C.G.A. § 18–2–74(b)). The most relevant factors in this case are:

(2) The debtor retained possession or control of the property transferred after the transfer; . . .

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets; [and]

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

*Id.*

The Court has reviewed the evidence Plaintiff presented in light of these factors and finds that Plaintiff successfully establishes a prima facie case of intentional fraud. First, Plaintiff presents evidence that the T & B/Habif transaction resulted in a transfer of substantially all of T & B's assets. For example, the Assignment and Assumption Agreement entered into on November 1, 2008 expressly provides that T & B, P.C. agreed "to sell, transfer, assign and contribute to [Habif] all of the assets used in connection with the Company's business." (T & B Defs. Resp. Mot. Compel., Ex. H, Doc. 104–6 at 1, 4.)

Second, shortly after the transfer was made, T & B became insolvent. An October 20, 2008 Powell Goldstein Memorandum confirms that the parties intended the ultimate result of the transaction to be the liquidation and dissolution of T & B, P.C. (Pl. Reply Defs. Resp. Mot. Compel, Worley Decl. Ex. 4, Doc. 116–4).

Third, this transfer of T & B's corporate goodwill to Habif occurred just after T & B became aware of Verso's potential lawsuit against it. T & B expressed concerns about a "situation" involving Verso on April 15, 2008 when it contacted its professional liability insurer, CAMICO. (Motion to Compel CAMICO, Evangelista Decl. Ex. 5, Doc. 89–2 at 67–68.) Some evidence suggests that T & B's main concern was "exposure with the Verso engagement relating to [Generally Accepted Auditing Standards ('GAAS') and Generally Accepted Accounting Principles ('GAAP')] is-

---

**26.** On June 18, 2012, the Court held that Plaintiff failed to allege sufficient facts to support a claim for constructive fraudulent transfer. (Doc. 31 at 19.) On the other hand, the Court held that Plaintiff's allegations in Count 17 of his Second Amended Complaint were sufficient to support intentional fraudulent transfer. (Doc. 31 at 19 (citing 2d Am. Compl. ¶¶ 486–490).)

sues." (Motion to Compel CAMICO, Evangelista Decl. Ex. 8, Doc. 89–2 at 75–79, 77 (T & B board meeting notes)); *see also id.* Ex. 7, Doc. 89–2 at 72–74 (noting that Defendant Murovitz, an individual T & B Shareholder, contacted Verso to ask about whether T & B should resign as auditors of Verso). Verso filed for bankruptcy on April 25, 2008 and within a month, T & B retained Carlock Copeland to investigate potential exposure. (*See* Pl. Reply CAMICO's Opp. Pl. Mot. Compel, Doc. 110, at 9 n.3 (recognizing the letter from CAMICO to Murovitz); Pl. Omnibus Opp. Defs. Mot. Quash Subpoena, Doc. 54, at 7 (same); CAMICO Opp. Pl. Motion Compel, Doc. 98, at 5 (same); Second Wilson Decl., Doc. 99, ¶ 6.) All the while, T & B and Habif continued working towards the transfer of its goodwill to Habif. (*See, e.g.,* Jan. 23, 2013 Ex. 13; Sutherland Memo, Dec. 7, 2012 Hrg. Ex. 4, Doc. 87–4.) The parties ultimately executed a transfer of the goodwill on October 31, 2008. (*E.g.,* Mot. Withdraw Exs. G, H, I.)

Fourth, because the T & B Shareholders became shareholders of Habif after the transaction, T & B Shareholders arguably retained possession of the transferred goodwill. (*See* Habif Shareholder Operating Agreement, Pl. Reply Defs. Resp. Mot. Compel, Worley Decl. Ex. 19, Doc. 116–19 (recognizing that the T & B Shareholders became members of Habif)).

Finally, the Plaintiff has pointed to at least some evidence that T & B attempted to conceal the nature of this transfer of goodwill. On a number of occasions, the Defendants represented the transaction as a merger. (*See, e.g.,* Omnibus Mot. Compel. Evangelista Decl. Ex. 16, Doc. 89–2 at 120–130, 129 (Jan. 16, 2009 letter from Habif to PCAOB; Evangelista Decl. Pursuant to Dec. 12, 2012 Order, Ex. 1(h), Doc. 68–1 (referring to Habif as "successor to Tauber & Balser, P.C."))). The Defendants now argue that Habif is in fact not the successor in interest to T & B. (*See* Evangelista Decl. ¶ 7, Ex. 6; Adversary Proceeding, T & B Initial Disclosures, Doc. 19–2 at 3 (stating that " "Habif, Arogeti & Wynne, LLP" has never merged with Tauber & Balser, P.C., nor is it a successor company")). Moreover, there is some evidence that Defendants concealed the transaction to the extent it involved an initial transfer of T & B, P.C.'s goodwill to the individual defendants. The T & B Defendants amended the Shareholder Agreement on the eve of the goodwill contribution to Habif in a manner that was arguably intended to result in the transfer of goodwill from the corporation to the individual shareholders. However, the Defendants failed to reveal this fact to Plaintiff, the Bankruptcy Court, or this Court for years, offering ignorance of this amendment as their only excuse for their failure to disclose. (*See* Court's Analysis of Plaintiff's Motion for Sanction, *infra.*)

The indicia of fraud revealed by this evidence are more readily ascertainable when viewed in totality and in combination with Defendants conduct during the course of this litigation. Thus, the Court provides the following timeline of the most relevant events, including the Defendants' discovery-related conduct discussed in the Court's Analysis of Plaintiff's Motion for Sanctions, Section III, *infra.*

### Timeline of Events

| Date | Event |
| --- | --- |
| Dec. 20, 2007 | T & B, P.C. enters into operating agreements with its shareholders. The agreements contain Section 3.06(b), the post-termination compensation provision, which limits the extent to which a Shareholder–Employee can solicit work from T & B clients after |

| | termination. In particular, Section 3.06(b) essentially provides that, once the shareholder-employee leaves T & B, P.C., he must remit to the corporation, for five years, 18% of the gross fees he collects for work performed for clients he had while he worked at T & B. |
|---|---|
| Mar. 14, 2008 | T & B, P.C. and Habif enter into a Letter of Intent evidencing a proposed transaction between the two entities. |
| Apr. 9, 2008 | T & B, P.C. and Habif decide not to go through with the transaction. |
| Apr. 15, 2008 | T & B, P.C. notifies its insurer, CAMICO, of a "situation involving [Verso]." One concern was whether T & B, P.C. would get paid for the services it provided Verso |
| Apr. 25, 2008 | Verso filed for bankruptcy. |
| April/May 2008 | T & B expresses concern about liability to Verso for T & B's own provision of accounting services. |
| June–Aug., 2008 | Negotiations between T & B, P.C. and Habif resume. |
| | T & B and its counsel recognize that the T & B goodwill, valued at $9 million or more, represents most of the assets to be contributed to Habif. |
| | T & B's and its counsel consider tax implications if the T & B Shareholders contribute goodwill to Habif as part of the transaction. Extensive discussions ensue regarding whether the goodwill is corporate or professional (also called personal). |
| June–Aug., 2008 (cont.) | A lawyer at Taylor English considered the tax implications of this transaction on T & B's behalf. He stated that if the goodwill is corporate, but the shareholders individually contribute the goodwill to Habif, the transaction would pose the highest risk because the IRS could be expected to argue that the transaction included an initial distribution of the goodwill to the shareholders, which would be a significant taxable event. |
| | Sutherland, counsel for T & B, recommends the termination of Section 3.06 of the 2007 Shareholder Operating Agreement to further the characterization that the goodwill was professional (not corporate). |
| Early Oct., 2008 | Sutherland drafts a memorandum now recognizing the absence (or near absence) of corporate goodwill in T & B, P.C., regardless of Section 3.06. |
| Oct. 31, 2008 | T & B and the T & B Shareholders execute the 2008 Amended Agreement, which, among other changes, eliminates Section 3.06. The 2008 Amended Agreement purports to be retroactively effective as of Feb. 1, 2007. |
| Nov. 1, 2008 | The T & B/Habif transaction closes. As part of the transaction, the T & B Shareholders contribute their goodwill to Habif. |
| Dec. 24, 2008 | Habif responds to a discovery request in an unrelated matter and refers to itself as "successor to Tauber & Balser, P.C." |
| Jan. 15, 2009 | Bryan Cave (formerly Powell Goldstein) provides executed copies of closing documents but does not list the 2008 Amended Agreement as one of these documents. |
| Jan. 16, 2009 | Habif sends letter to the PCAOB stating that T & B, P.C. "merged its practice into [Habif] effective Nov. 1, 2008." |
| Apr. 23, 2010 | Verso's Liquidating Trustee initiates the adversary proceeding against Tauber & Balser, P.C. |
| July 1, 2010 | T & B provides its initial disclosures in the adversary proceeding stating that Habif has never merged with T & B, P.C. T & B |

| | nonetheless identified itself as "Tauber & Balser, P.C. (n/k/a Habif, Arogeti & Wynne, LLP)." (Doc. 19–2 at 3.) |
|---|---|
| March, 2011 | Bankruptcy Judge Bihary directs the T & B Defendants to produce the Shareholder Agreements in effect in 2007. Plaintiff subsequently produces the 2007 Shareholder Operating Agreement but not the 2008 Amended Agreement that, by its own terms, was in effect in 2007. |
| Nov. 3, 2011 | This Court withdrew the reference to the Bankruptcy Court. |
| Oct. 23, 2012 | In response to Plaintiff's request for admissions, the T & B Defendants admit that the 2007 Shareholder Agreement was never amended or terminated. |
| Dec., 2012 | This Court directs Defendants to produce certain documents in response to Plaintiff's subpoenas. |
| Jan. 22, 2013 | T & B Defendants received a copy of the 2008 Amended Agreement. |
| Apr. 5, 2013 | T & B Defendants move to withdraw their admission that the 2007 Shareholder Agreement had never been amended or terminated. |

The Court recognizes that the Defendants have made reasonable arguments to contradict Plaintiff's allegation of a fraudulent transaction. For example, the Defendants assert that counsel provided Defendants with advice regarding the tax implications of the T & B/Habif transaction, and that there is no evidence that such advice involved in any way concealing assets from a potential creditor like Verso. (Doc. 78 at 8; Doc. 79 at 7–8.) And as mentioned, there is some evidence suggesting that the goodwill might have been personal goodwill all along. If true, there would have been no corporate distribution of goodwill. But in assessing the crime-fraud exception the Court looks only for prima facie evidence of a fraudulent transfer, without considering the existence of evidence to the contrary. *See Rose,* 586 S.E.2d at 42. As the Court finds prima facie evidence of a fraudulent transfer, it now considers whether communications with counsel were closely related to this transfer and thus discoverable.

### b. Communications Made in Furtherance of the Alleged Fraudulent Transfer

The crime-fraud exception applies to any communications with counsel made in furtherance of the alleged fraudulent transfer or closely related to it. *Cleckler,* 265 Fed. Appx. at 853. However, the crime-fraud exception will only vitiate the attorney-client privilege as to communications occurring prior to the fraudulent transfer. *Both v. Frantz,* 278 Ga.App. 556, 629 S.E.2d 427, 433–34 (2006); *Atlanta Coca–Cola Bottling Co. v. Goss,* 50 Ga.App. 637, 179 S.E. 420, 421 (1935) ("As to violations of law or commissions of fraud, however, the protection extends only to communications after the act or transaction is finished. It does not cover communications respecting proposed infractions of the law in the commission of a crime or the perpetration of a fraud.").

▬ The Plaintiff has failed to identify precise documents on the Defendants' privilege logs indicating communications made in furtherance of the alleged fraudulent transfer. Instead, Plaintiff makes the blanket request for all documents created on or before August 25, 2009, the date Plaintiff's counsel first notified T & B Defendants' counsel of Plaintiff's potential claim against them. Nonetheless, Plaintiff has shown examples of numerous communications made prior to the execution of

the Goodwill Contribution Agreements, (e.g., Mot. Withdraw Exs. G, H, I), between Defendants and their transaction counsel regarding the decision to transfer goodwill from T & B (or the individual T & B Shareholders) to Habif. (*See, e.g.,* Habif Privilege Log, Doc. 103–2 at 5–9 (Nos. 1, 2, 24); T & B Privilege Log, Doc. 104–2 at.) Moreover, several communications on Defendants' privilege log appear to fall within this category. Plaintiff has therefore produced prima facie evidence that (1) the T & B Defendants consulted with counsel regarding the transfer of goodwill, and (2) in response to this advice, terminated the 2007 Shareholder Agreement and transferred the goodwill possibly in violation of UFTA. Although this evidence may be rebutted later, it is sufficient now to trigger the crime-fraud exception.

Accordingly, the Court **DIRECTS** the Defendants to produce, to the extent not already produced, all documents evidencing any communication with counsel on or before the execution of the Goodwill Contribution Agreements, relating to the transfer of goodwill from T & B (or the individual T & B Shareholders), regardless of any assertion of attorney-client privilege.

### 2. Work Product Doctrine

■■■■■ Unlike the attorney-client privilege, the scope of protection provided by the work product doctrine is a procedural question and thus governed by federal law in a diversity action. *See Underwriters Ins. Co. v. Atlanta Gas Light Co.,* 248 F.R.D. 663, 667 (N.D.Ga.2008) (Carnes, J.) (citing *Shipes v. BIC Corp.,* 154 F.R.D. 301, 305 (M.D.Ga.1994)). The work product privilege provides a qualified immunity for materials prepared in anticipation of litigation by a party, an attorney, or other representatives of the party. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Rule 26(b)(3)(A)(ii) pro-

tects from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)" unless the requesting party "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed.R.Civ.P. 26(b)(3)(A)(ii). "[T]he burden is on the party withholding discovery to show that the documents should be afforded work-product [protection]." *Fojtasek v. NCL (Bahamas) Ltd.,* 262 F.R.D. 650, 654 (S.D.Fla.2009).

Plaintiff argues that the work product doctrine does not shield Defendants' documents created before August 25, 2009, the date that Plaintiff first put Defendants on notice of any potential claim, because "Defendants had no notice of any claim against T & B relating to Verso until that time." (Doc. 88–1 at 22.) Plaintiff essentially argues that such documents were not "prepared in anticipation of litigation." In their responses, the Defendants do not challenge this assertion, except to the extent the T & B Defendants argue that certain communications with CAMICO or documents created by CAMICO are protected by the work-product doctrine. (*See* Doc. 104–1 at 11–17.) The Court will consider the CAMICO-related documents separately in its analysis of Plaintiff's Motion to Compel against CAMICO, *infra.* As to all other documents, however, the Court finds that, by failing to assert any basis for the application of the work product doctrine, the Defendants have not met their burden. Accordingly, the Defendants are **DIRECTED** to produce any document, responsive to Plaintiff's requests, that was created prior to August 25, 2009, other than the CAMICO-related documents, (*see*

T & B Privilege Log, Doc. 104–2 at 13–14 (Nos. 132, 135, 136, 140–143, 145, 147, 150–156)), whose sole basis for protection is the work-product doctrine. (*See, e.g.,* Habif Privilege Log, Doc. 103–2 at 14–15 (Nos. 38, 39, 42).)[27]

### 3. Common Interest Privilege

█ The "Common Interest Rule" (also known as "common interest privilege") is an exception to a waiver of attorney-client privilege or work product doctrine. Under this rule, parties who share "strong common interests" may also share privileged or protected material without waiving the privilege or protection. *See McKesson Corp. v. Green,* 266 Ga.App. 157, 597 S.E.2d 447, 452 (2004) (recognizing this rule in the context of the work product doctrine). "[T]he doctrine applies where (1) communications are made by separate parties in the course of a matter of common interest (though there need not be a complete unity of interests; parties may be adversaries on other issues), (2) the communications are designed to further the parties' common interests, and (3) the privilege has not been waived by either party at the time the communications are made." Paul Milich, Ga. Rules of Evidence, § 21:5 Joint Defense doctrine at n.4

"[T]he common interest ... may be either legal, factual, or strategic in character. The interests of the separately represented clients need not be entirely congruent." Restatement (Third) of the Law Governing Lawyers § 76 cmt. e (cited in *In re Teleglobe Comm'ns Corp.,* 493 F.3d 345, 365 (3d Cir.2007)). Disclo-

sure to an adversary, however, will obviously result in waiver. *McKesson Corp.,* 597 S.E.2d at 453.

█ The T & B Defendants' appear to assert the common interest privilege to protect only a narrow selection of documents.[28] In a section of their Response to Plaintiff's Omnibus Motion to Compel entitled "Community of Interest Privilege," the T & B Defendants state, "As the Court will see from the privilege log, (Ex. O), the Tauber Defendants claim no privilege except for communications with Habif after Plaintiff announced his intention to sue Habif in early 2011", when Habif and the T & B Defendants became co-defendants. (Doc. 104 at 18.) The privilege log, however, asserts the common interest privilege and work product doctrine as to "[a]ll communications with Habif, Arogeti & Wynne, LLP and its counsel" without specifying a date. (T & B Privilege Log, Doc. 104–12, at 12.) Nonetheless, the Court takes the T & B Defendants' at their word that they only seek to apply the common interest privilege to communications originating after Plaintiff indicated his intention to sue Habif. (*See* Doc. 104 at 18; *see also* at Dec. 7, 2012 Hrg. Tr., Doc. 65, at 52 (Gross) (stating that the "catch-all categories" of documents on the privilege log "don't really have anything to do with the transactional documents that have been subpoenaed")). Such communications do not waive the attorney-client privilege because all the Defendants in this action share the strong interest in a coordinated

---

**27.** Most of the Defendants' work product doctrine assertions apply to documents that Defendants also assert are protected by the attorney-client privilege. (*See, e.g.,* T & B Privilege Log, Doc. 104–12 at 1; Habif Privilege Log, Doc. 103–2 at 5–6.)

**28.** The Habif Defendants do not appear to assert the common interest privilege as to any

documents. (*See* Habif Privilege Log, Doc. 103–2.) CAMICO however asserts the common interest privilege as to some communications between it and the T & B Defendants. The Court considers CAMICO's assertion of the common interest privilege below in its analysis of Plaintiff's Motion to Compel CAMICO, *infra.*

defense strategy. *See In re Teleglobe,* 493 F.3d at 365–66.[29]

█ Plaintiff also argues that "[t]here is no common interest between the T & B entity and the T & B Shareholders (including the Individual T & B Defendants), who share the same counsel and have completely adverse interests as to the fraudulent conveyance issues." (Pl. Memo. Law Supp. Omnibus Mot. Compel Discovery, Doc. 88–1, at 25.) This argument is misplaced and without merit. The T & B Defendants do not appear to assert a common interest privilege as to any such communications. And in any case, while it may be true that T & B, P.C. and the individual Shareholders do not stand in the same position regarding Plaintiff's fraudulent transfer *claim,* this fact is irrelevant here. Instead, the Court looks to whether, at the time of the communications, the transferor and transferee shared a "strong common interests." Both the company and the shareholders had a strong interest in avoiding a significant tax event when they communicated about the T & B/Habif transaction. The Court finds that T & B, P.C. and the individual T & B Shareholders shared a sufficiently strong common interest to warrant the application of the attorney-client privilege to any communications among them and their counsel regarding the transaction with Habif that originated prior to Plaintiff's assertion of a fraudulent transfer claim.[30]

## C. Plaintiff's Demand to Inspect Computers

Plaintiff argues that "Defendants' egregious stonewalling in this action has prevented Plaintiff from getting at the truth for more than two years." (Doc. 115 at 10.) According to Plaintiff, "[t]he only effective remedy left is to grant Plaintiff access to Defendants' computers for an appropriate forensic examination." (*Id.*) The Court has thoroughly reviewed the record in this manner and determines that such a remedy is unnecessary at this time.

## III. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Omnibus Motion to Compel [Doc. 88]. The Court finds that the crime-fraud exception applies to privileged communications between the T & B Defendants and their counsel regarding the transfer of goodwill from T & B (or the individual T & B Shareholders) and Habif. Thus, the Court **DIRECTS** the Defendants to produce, to the extent not already produced, all documents responsive to Plaintiff's discovery requests that evidence any communication with counsel on or before the execution of the Goodwill Contribution Agreements, relating to the transfer of goodwill from T & B (or the individual T & B Shareholders), regard-

29. Any other communications between the T & B Defendants and their counsel on one hand and the Habif Defendants or their counsel on the other, however, would result in a waiver of the attorney-client privilege. For example, communications with Habif regarding the T & B/Habif transaction are not protected by the attorney-client privilege and, as to those communications Habif and T & B do not share legal, factual or strategic common interest. More importantly, however, the T & B Defendants have not argued that such communications should be protected by the common interest privilege. Failure to produce such communications based on the common interest privilege will warrant sanctions absent a compelling justification for nondisclosure.

30. To be clear, this portion of the Court's analysis only addresses whether the T & B Defendants waived the attorney-client privilege by communicating among themselves or with the Habif Defendants.

less of any assertion of attorney-client privilege.

The Court also finds that, by failing to assert any basis for the application of the work product doctrine,[31] the Defendants have not met their burden to establish that the work product doctrine applies. Accordingly, the Defendants are **DIRECTED** to produce any document created prior to August 25, 2009, other than the CAMICO-related documents, (*see* T & B Privilege Log, Doc. 104–2 at 13–14 (Nos. 132, 135, 136, 140–143, 145, 147, 150–156)), whose sole basis for protection is the work-product doctrine. (*See, e.g.,* Habif Privilege Log, Doc. 103–2 at 14–15 (Nos. 38, 39, 42).)[32]

In addition, the Court finds that the T & B Defendants did not waive the attorney-client privilege by communicating with Habif or Habif's counsel after Plaintiff indicated his intention to sue Habif because all the Defendants in this action share a strong interest in a coordinated defense strategy. Nor have the T & B Defendants waived the attorney-client privilege by discussing among themselves, prior to Plaintiff's assertion of a fraudulent transfer, the decision to transfer goodwill. The T & B Defendants do not appear to assert the common interest privilege as to any other communications.

Finally, the Court declines Plaintiff's request for access to Defendants' computers for a forensic examination.

### Plaintiff's Motion to Compel Production of CAMICO Documents

Plaintiff filed two motions to compel on February 22, 2013 and in both, he seeks communications between CAMICO and Carlock Copeland, T & B's professional liability insurer and counsel, respectively. (Docs. 88, 89.) For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion.

## I. BACKGROUND

### A. Factual Background

Tauber & Balser, P.C. had a $5 million professional liability insurance policy with CAMICO, effective November 1, 2007 through December 21, 2008. (Pl. Mot. Compel CAMICO Prod. Docs. Responsive to Subpoena ("Motion to Compel CAMICO"), Evangelista Decl. Ex. 4, Doc. 89–2 at 39–66 ("CAMICO Policy").) In addition to its coverage for certain claims against the insured, the CAMICO Policy provided benefits "designed to minimize [the insured's] professional liability exposure by helping [the insured] manage [its] firm." (*Id.* at 53.) Consistent with these benefits, CAMICO states that it "assigns attorneys in anticipation of litigation at an early stage to attempt to mitigate or prevent claims from being asserted." (Wilson Decl., Doc. 60–1, ¶¶ 3–5.) The policy also provided a reduced deductible if the insured notifies CAMICO of a potential claim before the actual claim is made against the insured. (*See* Motion to Compel CAMICO, Evangelista Decl. Ex. 6, Doc. 89–2 at 69–71.)

On April 15, 2008, Leslie Balmforth, Chief Operating Officer of T & B, P.C., emailed CAMICO regarding a "situation involving a public company client." (Motion to Compel CAMICO, Evangelista

---

**31.** This directive does not apply to correspondence with CAMICO or documents created by CAMICO, which are considered separately in the Court's analysis of Plaintiff's Motion to Compel Production of CAMICO Documents, *infra.*

**32.** Most of the Defendants' work product doctrine assertions apply to documents that Defendants also assert are protected by the attorney-client privilege. (*See, e.g.,* T & B Privilege Log, Doc. 104–12 at 1; Habif Privilege Log, Doc. 103–2 at 5–6.)

Decl. Ex. 5, Doc. 89–2 at 67–68.) Balmforth noted that its client, Verso, was a "going concern risk, as indicated in [the T & B prepared Verso] 10K report that has not yet been filed." (*Id.*) She explained that T & B was reluctant to file the 10K because Verso had not paid any of its $450,000 outstanding balance. (*Id.*) "[We] are very concerned of the exposure and risk we put ourselves in if [Verso] liquidates (our engagement letter stipulates that we must be paid prior to filing [the 10K])." (*Id.*) "On the other hand," she explained, "if [Verso] fails to file [the 10K], the underlying problems with the SEC and being de-listed, etc. will create a situation whereby further financing will be highly unlikely." (*Id.*) Without further financing of Verso, T & B was unlikely to get paid. (*See id.*) CAMICO did not open a claims file at this time. (*See id.* Ex. 1, Doc. 89–2 at 26–28.)

On April 25, 2008, Verso filed for bankruptcy. Around this time, T & B and the T & B Shareholders continued discussing T & B's potential exposure. Not only was T & B concerned that Verso might not pay its bills, it also was concerned about "exposure with the Verso engagement relating to [Generally Accepted Auditing Standards ('GAAS') and Generally Accepted Accounting Principles ('GAAP')] issues." (Motion to Compel CAMICO, Evangelista Decl. Ex. 8, Doc. 89–2 at 75–79, 77 (T & B board meeting notes)); *see also id.* Ex. 7, Doc.

89–2 at 72–74 (noting that Defendant Murovitz, an individual T & B Shareholder, contacted Verso to ask about whether T & B should resign as auditors of Verso).[33]

On May 20, 2008, at CAMICO's direction, T & B retained Carlock Copeland to conduct an investigation in connection with potential claims relating to T & B's Verso engagements. (*See* Pl. Reply CAMICO's Opp. Pl. Mot. Compel, Doc. 110, at 9 n.3 (recognizing the letter from CAMICO to Murovitz); Pl. Omnibus Opp. Defs. Mot. Quash Subpoena, Doc. 54, at 7 (same); CAMICO Opp. Pl. Motion Compel, Doc. 98, at 5 (same); Second Wilson Decl., Doc. 99, ¶ 6.)[34]

Then on June 9, 2008, CAMICO sent T & B a letter stating that there were "no coverage issues that are apparent in this matter, based on the limited information we received to date." (Motion to Compel CAMICO, Evangelista Decl. Ex. 1, Doc. 89–2 at 26–28.) Accordingly, CAMICO stated that it had not opened a "Claim File." (*Id.*)

> We may at some point decide to assign legal counsel from our defense panel to this matter. The purpose of such assignment would be to provide you with pre-claim assistance in order to avoid or mitigate a potential Claim.

(*Id.*)

In their briefing on Plaintiff's Motion to Compel, neither the parties nor CAMICO

---

**33.** In Plaintiff's Motion to Compel, he strings together a series of facts and allegations to conclude that CAMICO must have been involved in "workpaper augmentation and spoliation matters." (Pl. Memo. Supp. Motion to Compel CAMICO, Doc. 89–1, at 12.) For example, Plaintiff states that CAMICO assisted T & B in creating a "self-serving May 22, 2008 letter to Verso's former management and Audit Committee members regarding the Laurus Master Fund's exercise of the subjective acceleration clause in its credit facility—the event that triggered Verso's bankruptcy." (*Id.* at 10.) The Court reviewed Plaintiff's

citations to the record and found insufficient support for these assertions.

**34.** Although the Court was unable to find this May 20, 2008 letter on the record, Plaintiff acknowledges that the letter purports to assign Carlock Copeland to represent T & B at this time. The T & B Defendants have provided this letter for the Court's in camera inspection and evidently, this letter has been produced to Plaintiff. (Motion to Compel CAMICO, Evangelista Decl., Ex. 13 ("T & B Privilege Log"), Doc. 89–2 at 109 (No. 131).)

clearly directed the Court to the events that transpired over the next year involving CAMICO. However, CAMICO's privilege log indicates that Carlock Copeland continued to send regular invoices to CAMICO from September 2008 through September 24, 2009. (*See* CAMICO Br. Opp. Pl. Mot. Compel, Ex. 1 ("CAMICO Privilege Log"), Doc. 98–1 at 2–4 (Nos. 10, 14, 17, 20, 27, 30, 31).) In addition, the T & B Defendants note on their privilege log that between November 2008 and December 2010, they received checks for attorney's fees from CAMICO. (T & B Privilege Log, Doc. 104–12, at 13 (No. 132).)

Plaintiff notified T & B Defendants' counsel of his potential claim against them on August 25, 2009.

## B. Procedural Background

On November 9, 2012, Plaintiff served CAMICO with a subpoena to produce documents. (Motion to Compel CAMICO, Evangelista Decl. Ex. 1., Doc. 89–2 at 9–25 ("CAMICO Subpoena").) Plaintiff sought documents related to its underwriting and coverage of T & B, P.C. and in particular, those associated with any claims or potential claims relating to T & B's engagements with Verso. (*See, e.g.,* CAMICO Subpoena, Doc. 89–2 at 22–23 (Request Nos. 4, 6, 8.))

CAMICO objected to the subpoena in its entirety. (Motion to Compel CAMICO, Evangelista Decl., Ex. 2, Doc. 89–2 at 31–33 ("CAMICO Objection").) CAMICO argued primarily that Plaintiff's requested documents were either irrelevant to the underlying litigation or created in anticipation of litigation and thus not discoverable. CAMICO did not provide a privilege log at this time.

On November 16, 2012, the T & B Defendants moved to quash this subpoena to CAMICO asserting the same basic arguments as CAMICO. (T & B's Mot. Quash Subpoenas, Doc. 51.) After full briefing on this motion was complete, the Court held a hearing. (*See* Dec. 7, 2012 Hrg. Tr., Doc. 65, at 58–64; Dec. 12, 2012 Hrg. Tr., Doc. 66, at 41–58.) At the hearing, Plaintiff's counsel agreed to narrow the scope of his request. Plaintiff's counsel stated that Plaintiff is not seeking CAMICO's proprietary information such as its underwriting methodologies and processes. (*see also* Dec. 12, 2012 Hrg. Tr. at 47–48.) Nor is Plaintiff interested in "communications related to [CAMICO's] evaluation of the plaintiff's claims." (Dec. 12, 2012 Hrg. Tr. at 49.) Rather, Plaintiff appeared interested in communications between CAMICO and T & B regarding the potential claims arising out of the Verso engagement—documents likely in T & B's possession. (*Id.* at 48.) As to those documents, Plaintiff argued that the work product doctrine did not apply, and even if it did, the crime fraud exception warranted their production. (*See* Pl. Omnibus Opp. Defs. Mots. Quash Supboena ("Pl. Omnibus Resp."), Doc. 54, at 25 (arguing that the work product doctrine does not protect documents "generated in the early stages of claims investigation (such as the Carlock Copeland firm's investigation)").) Based on this hearing, the Court denied the motion to quash but reserved ruling on the work product doctrine issue. The Court then ordered the T & B Defendants to confer with CAMICO to provide the subpoenaed documents to the Court for *in camera* inspection along with an accompanying privilege log. (*See* Doc. 62.)

On February 22, 2013, Plaintiff filed two Motions to Compel. (Doc. 88, 89.) In Plaintiff's Omnibus Motion to Compel Documents directed towards the Defendants, Plaintiff seeks communications between the T & B Defendants and CAMICO regarding the Verso engagement. (Pl. Omnibus Motion Compel ("Omnibus Motion"),

Doc. 88, at 3.). In his Motion to Compel directed towards CAMICO, Plaintiff seeks similar documents in CAMICO's possession. (Doc. 89.)

In his Motions to Compel, Plaintiff reiterates the narrowed scope of his document request with respect to CAMICO. (*See* Pl. Memo. Supp. Motion to Compel CAMICO, Doc. 89–1, at 18.) In particular, Plaintiff appears to seek only communications between Carlock Copeland (or the T & B Defendants) and CAMICO prior to August 25, 2009. (*Id.* at 7 n.6.) The Court now turns to the merits of Plaintiff's motions to compel the production of these CAMICO-related documents.

## II. ANALYSIS

CAMICO and the T & B Defendants refuse to produce a small set of documents to Plaintiff asserting the work product doctrine and the common interest privilege. (CAMICO Privilege Log, Doc. 98–1; T & B Privilege Log, Doc. 104–12, at 13–14.) Plaintiff challenges both assertions. Plaintiff first argues that the work product doctrine did not attach to CAMICO related documents until August 25, 2009, and even if it applied earlier, Plaintiff's substantial need for the documents, and the documents' unavailability elsewhere, warrant their production. (Pl. Memo. Supp. Motion to Compel CAMICO, Doc. 89–1, at 20–24.) He then argues that the crime-fraud exception applies to any assertions of privilege or protection regarding communications with CAMICO. (*Id.* at 18–20.) The Court considers each assertion in turn.

### A. *Work Product Doctrine*

Rule 26(b)(3)(A)(ii) protects from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)" unless the requesting party "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed.R.Civ.P. 26(b)(3)(A)(ii). "[T]he burden is on the party withholding discovery to show that the documents should be afforded work-product [protection]." *Fojtasek v. NCL (Bahamas) Ltd.,* 262 F.R.D. 650, 654 (S.D.Fla.2009).

 Insurance claim files generally do not constitute work product in the early stages of investigation, when the insurance company is primarily concerned with "deciding whether to resist the claim, to reimburse the insured and seek subrogation ... or to reimburse the insured and forget about the claim thereafter." *Underwriters Ins. Co. v. Atlanta Gas Light Co.,* 248 F.R.D. at 667 (quoting *Carver v. Allstate Ins. Co.,* 94 F.R.D. 131, 134 (S.D.Ga.1982)). As the court explained in *Carver,* claim files "straddle both ends of this definition, because it is the ordinary course of business for an insurance company to investigate a claim with an eye toward litigation." 94 F.R.D. at 134. Once litigation is imminent, however, the claims investigation file is maintained "in anticipation of litigation" and its contents are protected by the work product doctrine. *Underwriters Ins. Co. v. Atlanta Gas Light Co.,* 248 F.R.D. at 667; *see also Lett v. State Farm Fire & Cas. Co.,* 115 F.R.D. 501, 503 (N.D.Ga. 1987) (Forrester, J.) (finding that reports prepared after a claim was reassigned from a regular representative to a senior representative, due to the company's suspicion of fraud, were protected by the work product doctrine).

 Where, as here, an underlying third party liability claim is involved, the federal courts have generally recognized that "the investigation is made in anticipa-

tion of claims, which, if denied, likely will lead to litigation." *Underwriters Ins. Co. v. Atlanta Gas Light Co.*, 248 F.R.D. at 668 (citing cases). "For this reason it is logical to conclude that, while files generated in relation to first party claims are made in the ordinary course of business and are discoverable, files generated during the investigation of third party claims are made in anticipation of litigation and are not discoverable." *Id.*

█ The Court finds that CAMICO and the T & B Defendants have failed to meet their burden of establishing that the work product doctrine attaches to documents created prior to August 25, 2009. Unlike in *Underwriters Insurance Company*, here the withheld documents were created before an actual or imminent third-party claim arose. Instead, these documents and communications appear to be part of CAMICO's ordinary course of business. And although in May 2008 CAMICO directed T & B to retain counsel in connection with potential claims relating to T & B's Verso engagement—a decision that was no doubt made "with an eye toward litigation"—T & B and CAMICO failed to show that at this time, actual litigation was imminent. In fact, CAMICO found by June 2008 that no coverage issues were apparent and that pre-claim legal assistance was not necessary. Other than August 25, 2009, CAMICO and the T & B Defendants point to no specific time when communications between T & B and CAMICO could have arguably been in anticipation of litigation. As the burden to establish the work product doctrine initially rests on the withholding party, the Court finds that the work product protection does not apply to CAMICO communications prior to August 25, 2009.

### B. Common Interest Privilege

CAMICO also withholds communications it had with T & B and T & B's counsel,

asserting the common interest privilege. Although on CAMICO's privilege log, CAMICO claims the common interest privilege for communications between it and T & B, P.C. (or T & B's individual Shareholders), (*see* CAMICO Privilege Log, Doc. 98–1 (Nos. 1, 9)), CAMICO only argues for the application of this doctrine to communications between it and T & B's *counsel* (*see* CAMICO's Br. Opp. Pl. Mot. Compel, Doc. 98, at 10–12). As the burden of establishing the privilege rests on the party withholding the documents, the Court finds that the common interest privilege does not protect CAMICO's communications with T & B, P.C. or the individual T & B Shareholders. The Court now turns to CAMICO's assertion of the common interest privilege to protect its communications with T & B's counsel.

█ Parties who share "strong common interests" may also share privileged or protected material without waiving the privilege or protection. *See McKesson Corp. v. Green*, 266 Ga.App. 157, 597 S.E.2d 447, 452 (2004) (recognizing this rule in the context of the work product doctrine). As such, an insurer's communications with the attorney assigned to represent the insured under an insurance policy are generally protected by this common interest or attorney-client privilege. *See, e.g., Underwriters Ins. Co.*, 248 F.R.D. at 670–71 (finding in an analogous case that the attorney-client privilege protects communications regarding the progress of a case between the insurer and the counsel the insurer retained to represent the insured); *Lectrolarm Custom Sys., Inc. v. Pelco Sales, Inc.*, 212 F.R.D. 567, 572–73 (E.D.Cal.2002) (holding that the common interest privilege protects communications between the insured and insurance company relating to the claims and defenses in an underlying lawsuit).

Here, CAMICO retained Carlock Copeland to counsel T & B, P.C. regarding potential Verso liability. Accordingly, communications between Carlock Copeland and CAMICO are protected. (*See, e.g.,* CAMICO Privilege Log, Doc. 98–1 (Nos. 2–6, 8, 11, 15–16, 18–19, 21–26, 28–29.))

### C. *Attorney–Client Privilege and Crime–Fraud Exception*

The T & B Defendants and CAMICO assert the attorney-client privilege as the basis for withholding some of the communications between them. (*See, e.g.,* T & B Privilege Log, Doc. 89–2 at 109–110 (Nos. 133, 134, 137, 138, 144, 146, and 148); CAMICO Privilege Log, Doc. 98–1 (Nos. 2–6, 8, 11–12, 15–16, 18–19, 21–26, 28).) The Court does not read Plaintiff's Motion to Compel as seeking these documents, except to the extent they are accessible via the crime-fraud exception. In addition to documents produced to Plaintiff, the Court reviewed a set of CAMICO documents *in camera*. Nothing in these documents suggest that communications with CAMICO were made in furtherance of any crime or fraud. Accordingly, the crime-fraud exception does not vitiate any otherwise valid assertions of the attorney-client privilege as to these documents.

### III. Conclusion

For the reasons explained above, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motions to Compel [Docs 88, 89] regarding T & B Defendants' communications with CAMICO. The T & B Defendants and CAMICO are **DIRECTED** to produce any document identified in their respective privilege logs created before August 25, 2009 whose sole basis for withholding is the work product doctrine. Likewise, CAMICO is **DIRECTED** to produce to Plaintiff documents 1 and 9 on its

privilege log (Doc. 98–1) as CAMICO failed to support its assertion of the common interest privilege regarding communications with T & B, P.C. or the individual T & B Shareholders.

At this time, the T & B Defendants and CAMICO have no other obligations to produce to Plaintiff the communications between them.

### *Plaintiff's Motion for Sanctions*

### I. Introduction

On April 12, 2013, Plaintiff filed a Motion for Sanctions ("Sanctions Motion"). (Doc. 120.) Plaintiff urges the Court to impose sanctions upon the T & B, the Individual T & B Defendants, the other Shareholders of Tauber and Balser, and the Habif Defendants (collectively, "Defendants and Shareholders"). According to Plaintiff, the Defendants and Shareholders have misled Plaintiff, the Bankruptcy Court, and this Court about the nature of the T & B/Habif transaction and the existence of documents relevant to this transaction. Accordingly, Plaintiff moves the Court to sanction the Defendants and Shareholders in a variety of ways ranging from holding them and their counsel liable for attorney's fees to striking the Defendants' answers and entering default judgment on the entirety of Plaintiff's Amended Complaint.

For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Sanctions [Doc. 120].

### II. The Form of Plaintiff's Sanctions Motion

Plaintiff's Sanctions Motion suffers from serious structural and technical deficiencies that justify outright denial. For example, Plaintiff's brief in support of his Sanctions Motion exceeds 25 pages in violation of the Local Rules. "Absent prior

permission of the court, briefs filed in support of a motion or in response to a motion are limited in length to twenty-five (25) pages." LR 7.1D, NDGa. Plaintiff failed to obtain prior permission from the Court before filing a brief of 40 pages. Instead, Plaintiff filed a contemporaneous motion for a page limit extension. (Doc. 119.) Nonetheless, as Plaintiff's Sanctions Motion is now fully briefed, the Court **GRANTS** Plaintiff's motion for page-limit extension [Doc. 119.] However, in the future, the Court will only consider motions for page or deadline extensions filed in advance of the motion to which they refer.

In addition, Plaintiff abuses the page limit extension that he assumed would be granted. Much like Plaintiff's Omnibus Motion to Compel, discussed *supra*, Plaintiff's Sanctions Motion squeezes significant substantive material that should be presented in the main text into single-spaced footnotes, thus skirting the local rule requiring double-spaced text in the body of briefs. *See* LR 5.1C, NDGa. And Plaintiff again asks the Court to incorporate by reference the facts set forth in several other filings without specifying precisely what portion of these filings are meant to be incorporated. (*See, e.g.,* Pl. Memo. Law Supp. Mot. Sanctions, Doc. 120–1, at 5 n.3.) As the Court has previously explained, this is an unacceptable way of presenting material.

The Court could rightly deny Plaintiff's Sanctions Motion for its failure to conform to the letter and spirit of the Local Rules, but doing so would force the Court to ignore the serious discovery-related issues Plaintiff has identified. Thus, the Court will address the merits of Plaintiff's mo-

tion. However, the Court primarily relies on the text and record citations in the body of Plaintiff's brief, with only a cursory review of his additional material.[35]

### III. BACKGROUND

Discovery in this case is an extension of the discovery that began in the adversary proceedings during Verso's bankruptcy. *Laddin v. Tauber & Balser, P.C., et al.,* No. 10–09035–mgd (N.D.Ga.Bankr.) ("Adversary Proceeding"). Thus, the Court first briefly describes the relevant portions of the Adversary Proceeding and then addresses actions that have taken place in this Court.

#### A. Discovery During the Adversary Proceedings

Plaintiff filed his complaint against Tauber & Balser, P.C. (n/k/a Habif Arogeti & Wynne, LLP) on April 23, 2010. (Adversary Proceeding, Doc. 1.) At this time, Plaintiff believed that Habif was the successor to Tauber & Balser, P.C. On June 17, 2010, U.S. Bankruptcy Judge Joyce Bihary entered a scheduling order requiring that the parties file motions to join additional parties or to amend the pleadings by September 21, 2010 and October 21, 2010, respectively. According to this Order, discovery was to be completed by February 28, 2011. (*See* Adversary Proceeding, Docs. 10, 12.)

During discovery, Plaintiff received arguably contradictory information about Habif's status as the successor to T & B. For example, in T & B's initial disclosures on July 1, 2010, T & B stated that " "Ha-

---

**35.** The Court notes that the Defendants' filings suffer from some of the same deficiencies. For example, the Habif Defendants' response brief in opposition to Plaintiff's Sanctions Motion incorporates by reference their entire Response in Opposition to Plain-

tiff's Motion to Compel. The Court treats all parties in the same manner, focusing primarily on the body of the parties' supporting briefs and providing only cursory review of material incorporated by reference where no pinpoint citation is provided.

bif, Arogeti & Wynne, LLP" has never merged with Tauber & Balser, P.C., nor is it a successor company." (Adversary Proceeding, Doc. 19–2 at 3.) Nonetheless, T & B identified itself in those initial disclosures and subsequent discovery responses as "Tauber & Balser, P.C. (n/k/a Habif, Arogeti & Wynne, LLP)." (*Id.* at 1.) Likewise, the defendant served Plaintiff with a discovery request identifying itself as "Habif, Arogeti, & Wynne, LLP ('Habif Arogeti') as successor to Tauber & Balser, P.C." (Adversary Proceeding, Doc. 19–1 at 19.)

Several months later, on December 13, 2010, Plaintiff filed a motion to modify the scheduling order. (Adversary Proceeding, Doc. 19.) Among other requests, Plaintiff sought an extension of time to add Habif as a party. (*Id.*) Plaintiff argued that he had "every right to rely on" representations in the Defendant's own pleadings that Habif was the successor to T & B. (*Id.* at 15–16.) Plaintiff asserted that he (and the Bankruptcy Court) had been misled to believe that Habif was the successor to T & B, and thus requested an opportunity to add Habif as a party if necessary. (*Id.* at 16.) [36]

After a hearing, Judge Bihary granted Plaintiff's motion in a one-page Order. (Adversary Proceeding, Doc. 25.) She allowed continued discovery on the issue of successor liability and amended the scheduling order accordingly.

Discovery continued to proceed, and by March 2011, the parties reached an impasse regarding the production of certain documents. On March 23, 2011, Judge Bihary held a status conference. (*See* Adversary Proceeding, Doc. 38 ("Mar. 23, 2011 Hrg. Tr.").) [37] During the conference, the parties addressed, among other documents, the T & B Shareholder Agreements. Evidently, despite Plaintiff's request for T & B Shareholder Agreements in effect in 2007, the Defendants had not produced executed copies. (*See id.* at 52–54.) [38] Judge Bihary directed the Defendants to conduct a thorough search for these agreements and produce any employment agreements for 2005 through 2007. (*Id.* at 69.) [39] Finally, she directed Plaintiff to file an Amended Complaint to add Habif and certain claims by May 31, 2011. (*Id.* at 69.) On March 31, 2011, Judge Bihary entered a written order consistent with these directives. (Adversary Proceeding, Doc. 35.)

Plaintiff filed his Amended Complaint by Judge Bihary's deadline. (Adversary Proceedings, Doc. 48.) Shortly thereafter, the Defendants filed their motions to dismiss and then filed, along with Plaintiff, a consent motion to withdraw the reference. The Court granted the motion to withdraw on November 3, 2011.

---

36. Plaintiff also expressed concern that T & B Defendants were withholding documents relating to the T & B/Habif transaction. (*See* Adversary Proceeding, Doc. 37 ("Dec. 22, 2010 Hrg. Tr.") at 38–39.) However, the T & B Defendants' deadline to respond to this request had not yet passed.

37. This document is also Doc. 38 in this instant matter.

38. Counsel for T & B stated that T & B did not always keep signed copies of such documents. (Mar. 23, 2011 Hrg. Tr. at 53.) Judge Bihary found this statement hard to

believe. (*Id.* at 53 ("[T]ruthfully, it is hard to believe that there wouldn't be documents that were saved somewhere with respect to all this because five years is not that long a time.").)

39. Judge Bihary also recommended to Defendants' counsel that, if the Defendants search and find nothing more, they could file an affidavit stating "that there is nothing else, that they have no memory of signing [agreements], or they did sign something." (*Id.* at 54.) The Court is unaware of any such affidavit.

## B. Discovery in this Court[40]

After the Court ruled on the Defendants' motions to dismiss on June 18, 2012, (Doc. 31), the parties engaged in further discovery. Plaintiff served Defendants with a document request on September 19, 2012, requesting, among other things, T & B shareholder meeting notes and documents associated with T & B's insurance coverage. (Rogers Decl., Doc. 104–1, ¶ 11; Evangelista Decl. Ex. 1(1), ("Resp. Pl. 6th Req. Prod.").) Shortly thereafter, in November 2012, Plaintiff served subpoenas to produce documents upon several non-parties including CAMICO Mutual Insurance Company ("CAMICO"), T & B's professional liability insurer, (Doc. 51–4), and three law firms that counseled T & B and Habif on the transaction between them, (Docs. 51–2, 51–3, 51–5). The Defendants moved to quash these subpoenas on November 16, 2012, alleging, *inter alia*, that documents Plaintiff seeks are protected by the attorney-client privilege or work product doctrine. (Docs. 51, 52.)

The Court held a hearing on December 7 and 12, 2012, to address Defendants' motions to quash and related discovery issues. The Court considered: (1) whether Plaintiff produced sufficient evidence to apply the crime-fraud exception justifying the inapplicability of the attorney-client privilege as to certain communications; and (2) whether T & B's voluntary production of a privileged memorandum, (Dec. 7, 2012 Hrg. Ex. 4, Doc. 87–4 (the "Sutherland Memo")), constitutes a waiver of the attorney-client privilege as to all communications associated with that memorandum. (*See* Doc. 62.)

After the hearing, the Court made three primary decisions. First, because Plaintiff agreed to exclude documents generated in connection with the instant litigation from the scope of the documents sought in the subpoenas, the Court denied in part Defendants' motions to quash. (*Id.*) Second, the Court directed Defendants to confer with the non-parties to provide the remaining subpoenaed documents for *in camera* inspection so the Court could decide the issue of the crime-fraud exception. (*Id.*) Finally, the Court held that Defendants' voluntary production of the Sutherland Memo constituted a waiver of the attorney-client privilege as to associated communications and directed Defendants to produce documents accordingly. (*Id.*)[41] Shortly thereafter, the parties filed the instant discovery motions.

## IV. ANALYSIS

Plaintiff moves for sanctions pursuant to Rules 37(b) and 26(g) of the Federal Rules of Civil Procedure.[42] The Court first assesses Defendants' conduct in relation to each of these rules separately. *See Chu-*

---

**40.** For clarity, the court repeats here certain procedural facts stated in the Overview, *supra*.

**41.** On March 5, 2013, T & B, P.C. notified the Court that it waives the attorney-client privilege that protected the documents produced by Bryan Cave LLP. (Doc. 94.)

**42.** Several provisions of the Federal Rules provide for sanctions for conduct during discovery. *See, e.g.,* Fed.R.Civ.P. 37(c)(1) (sanctions for failure to disclose or supplement information pursuant to Rule 26(a) or (3)); Fed.R.Civ.P. 37(c)(2) (sanctions for failure to

admit what is requested under Rule 36 if the matter is later proved true); Fed.R.Civ.P. 37(d) (sanctions for failure to attend deposition). Plaintiff puts forth no basis for sanctions under any of these provisions of the Federal Rules. He appears to limit his request to sanctions pursuant to Rule 26(g) and 37(b). He also invokes Rule 60. Rule 60(b) allows for the relief from a final judgment in the case of "fraud." Fed.R.Civ.P. 60(b)(3). Plaintiff has not directly argued Rule 60's applicability to this case, nor does the Court see any reason to apply Rule 60 here.

*dasama v. Mazda Motor Corp.*, 123 F.3d 1353 (11th Cir.1997) (recognizing that the framework for imposing sanctions under Rules 37 and 26 differ and should be analyzed separately). Finding that the T & B Defendants have violated both Rules 37(b) and 26(g), the Court then determines the appropriate sanctions.

### A. Sanctions Under Rule 37(b)

█ Plaintiff seeks sanctions pursuant to Rule 37(b). Rule 37(b)(2) provides that the Court may impose sanctions if a party "fails to obey an order to provide or permit discovery." Fed.R.Civ.P. 37(b)(2)(A). Accordingly, to warrant sanctions, Plaintiff must (1) identify a discovery order or directive and (2) show that the order or directive has been violated. *See U.S. v. Certain Real Prop. Located at Route 1, Bryant, Ala.*, 126 F.3d 1314, 1317 (11th Cir.1997) (suggesting that the absence of a violation of a discovery order renders inappropriate the imposition of sanctions, particularly the harsh sanction of dismissal); *accord Melendez–Garcia v. Sanchez*, 629 F.3d 25, 33 (1st Cir.2010) ("The plain language of Rule 37(b) provides that before a court can impose sanctions, the offending party must 'fail[ ] to obey an order to provide or permit discovery.' ") (quoting Fed.R.Civ.P. 37(b)(2)(A)); 7 Moore's Federal Practice, § 37.42[1] (Matthew Bender 3d Ed.) ("The absence of a prior order or direction compelling discovery precludes Rule 37(b) sanctions."); Wright & Miller, 8B Fed. Practice & Procedure § 2289 (3d. ed. 2013).

The violated order, however, need not be a formal written order; Rule 37(b) sanctions may be imposed for violations of the Court's oral discovery directives as well. *See, e.g., Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 n. 7 (11th Cir. 1993) ("[An] oral discovery order is a valid basis for Rule 37 sanctions."); *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 787 (9th Cir.2011) ("The definition of 'order', in Rule 37(b) has been read broadly. Sanctions may be imposed even for violation of a court's oral order, as long as a party has unequivocal notice that court has asked that certain documents be produced."). Plaintiff argues that the Defendants have violated the Bankruptcy Court's March 23, 2011 Bench Order and corresponding March 31, 2011 Written Order.[43]

█ The Court finds that the T & B Defendants violated the Bankruptcy Court's March 23 and 31 Orders directing them to produce by April 22, 2011 "all shareholder, employment and related agreements in effect 2005 through 2007." (Adversary Proceeding, Doc. 35 at 2; Mar. 23, 2011 Hrg. Tr. at 69.) The T & B Defendants failed to produce by this deadline the 2008 Amended Agreement, which by its own terms was effective as of February 1, 2007. Instead, the T & B Defendants produced the 2008 Amended Agreement on January 22, 2013, nearly two years later. The T & B Defendants argue that this failure to produce was inadvertent, and counsel for the T & B Defendants avers that he only first became aware of the 2008 Amended Agreement in

---

**43.** Plaintiff also suggests that Habif has violated this Court's December 12, 2012 Bench Order and corresponding December 13, 2012 Written Order. (*See* Memo. Law Supp. Mot. Sanction, Doc. 120–1, at 27–29; Pl. Reply Habif Resp. Mot. Sanctions, Doc. 128 at 10–15.) Presumably, Plaintiff is referring to the following directive by the Court: "I don't care who owns it at this point. Whoever has

them needs to produce them." (Dec. 12, 2013 Hrg. Tr., Doc. 66, at 82–83.) The Court was unable to discern from Plaintiff's briefs precisely how Habif violated this directive. To the extent Plaintiff seeks sanctions against Habif for responding to this directive in of bad faith, the Court finds such sanctions are not warranted at this time.

December 2012. (Mot. Withdraw Admissions Ex. F ("Rogers Decl."), Doc. 112–6 ¶ 3.) The Court will consider this defense below when determining whether and to what extent sanctions are warranted.

### B. Sanctions Under Rule 26(g)

Plaintiff also seeks sanctions under Rule 26(g). Rule 26(g) authorizes the imposition of sanctions in certain circumstances. Pursuant to Rule 26(g)(1), every discovery response or objection must be signed by at least one attorney of record in the attorney's own name. Fed.R.Civ.P. 26(g)(1). This signature certifies compliance with the federal rules and the parties' discovery obligations.

> By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after reasonable inquiry ... (B) with respect to a discovery request, response, or objection, it is:
>
> (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;
>
> (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and
>
> (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

Fed.R.Civ.P. 26(g)(1)(B).

The comments to subsection (g)(1) clarify that Rule 26(g) broadly "imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37." Fed.R.Civ.P. 26(g) advisory committee's note. Thus, for example, Rule 26(g) "requires that the attorney make a reasonable inquiry into the factual basis of his response, request, or objection." *Id.; see, e.g., In re Delta/Air-Tran Baggage Fee Antitrust Litigation,* 846 F.Supp.2d 1335, 1351–52 (N.D.Ga. 2012) (Batten, J.).

Rule 26(g)(3) requires the Court to impose sanctions if a certification violates this rule without substantial justification. Fed.R.Civ.P. 26(g)(3); *see Chudasama,* 123 F.3d at 1372 (recognizing that the decision to impose sanctions is not discretionary when the Court finds that violation has occurred) (citing *Malautea,* 987 F.2d at 1545). "The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." *Id.*

■ After a thorough review of the record, the Court finds that the T & B Defendants and their counsel violated Rule 26(g) by admitting, without a thorough investigation, that the 2007 Shareholder Agreement was still in effect. As the Court described in its discussion of the T & B Defendants' motion to Withdraw, the T & B Shareholders and their counsel on that transaction spent months considering the effects of the 2007 Shareholder Agreement on any T & B/Habif transaction. After much consideration, they ultimately decided to amend the 2007 Shareholder Agreement so as to remove Section 3.06(b), a post-termination compensation provision that could be construed as establishing corporate (as opposed to personal) goodwill. Then, on the same day the T & B Shareholders executed their Goodwill Contribution Agreements, they also executed the 2008 Amended Agreement, which purported to be retroactively effective on February 1, 2007. (E.g., Mot. Withdraw Exs. G, H, I.)

As Judge Bihary recognized, it is hard to believe that the T & B or the Individual Shareholders did not retain an executed copy the Shareholder Agreements. But even if the Court accepts this to be true, a reasonable investigation by any of the Individual Defendants would have revealed that the T & B Shareholders did in fact amend their 2007 Shareholder Agreement (whether or not they could find the executed copy of the amendment). In fact, the T & B admits to having in its possession an unsigned copy of the 2008 Amended Agreement. (Doc. 112 at 2 n.1.) This document alone should have triggered a more thorough investigation, and the T & B Defendants provide no explanation for why they failed to uncover this document until responding to this Court's December 13, 2012 Order. The Court finds it perplexing that such a basic document (the operating agreement controlling the shareholder relationship), would only materialize upon a final sweep in the wake of this Court's order requiring production of documents responsive to Plaintiff's subpoena to a non-party.[44] Accordingly, the Court finds that sanctions are appropriate under Rule 26(g) for this conduct.

Plaintiff has put forth no other basis for the application of sanctions. The Court now turns to the question of what sanctions to impose.

### C. Appropriate Sanctions

Upon finding that Rule 37(b) has been violated, the Court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R.Civ.P. 37(b)(2)(C). Likewise, the Court must sanction a party who violates Rule 26(g) unless such violation is substantially justified. Fed.R.Civ.P. 26(g)(3). The imposition of expenses under Rule 26(g), however, is permissive. *Id.; see also Chudasama*, 123 F.3d at 1372 ("The decision of what sanction is appropriate [under Rule 26(g) ] . . ., is committed to the district court's discretion.").

Here, the Court has determined that the T & B Defendants violated Rules 37(b) and 26(g) by failing to timely produce the 2008 Amended Agreements or admit to their existence. The T & B Defendants counsel's only explanation for this failure was that he was unaware of the existence of the executed copy of these agreements until December 2012. As the Court has previously noted, a reasonable investigation would have revealed the executed 2008 Amended Agreement or, at the very least, that such agreements were entered into. The Court finds that the T & B Defendants and their counsel have failed to put forth a substantial justification for violating Rules 37(b) and 26(g). Accordingly, the Court imposes upon the T & B Defendants the reasonable expenses caused by the T & B Defendants' failure regarding the discovery of the 2008 Amended Agreement. The Court also imposes upon the T & B Defendants a portion of the cost of bringing this motion for sanctions.

---

44. The Court does not find that sanctions are appropriate for Defendants' delayed production of other documents such as the undated T & B corporate resolutions, May 14, 2008 Board meeting minutes, Habif's due diligence report, or T & B's September 2007 insurance application. (*See* Pl. Memo. Law Supp. Mot. Sanctions, Doc. 120–1 at 30–31.) *Unlike the* shareholder agreements, Plaintiff first requested these documents in September 2012. (*See* Pl. Mot. Sanctions, Ex. 3, Doc. 120–5.) Plaintiff has put forth insufficient evidence to support a violation of Rule 26(g) warranting sanctions.

Determining the precise cost of the Rule 37(b) and 26(g) violations is impossible. The Court finds however that a fair sanction would be the costs, including attorney's fees, associated with Plaintiff's subpoenas to Defendants' corporate counsel and attorney time expended in conjunction with these subpoenas. Plaintiff only learned of the 2008 Amended Agreement after serving a series of subpoenas on the Defendants' corporate counsel, and then pushing for the production of documents in response to such subpoenas in both written responses to the motions and oral argument before this Court. Of course, the 26(g) and 37(b) violations did not "cause" every expense related to the pursuit of these subpoenas. However, the Court has no reasonable way to tease out what portion of Plaintiff's cost are directly attributable to the T & B Defendants' violation. Moreover, many of the Plaintiff's previous efforts to draw out documents from the Defendants were also at least in part "caused" by Plaintiff's erroneous admission and failure to timely produce the 2008 Amended Shareholder Agreement.[45] The Court therefore imposes the following **SANCTION:**

The T & B Defendants and their counsel[46] are **DIRECTED** to pay the reasonable expenses, including attorney's fees, in connection with the following:

(1) Plaintiff's subpoenas to produce documents directed to (a) Bryan Cave, (b) Sutherland, and (c) Taylor English;

(2) Plaintiff's responses to motions to quash these subpoenas;

(3) Plaintiff's preparation and attendance at the December 7, 2012 and December 12, 2012 status conferences;[47] and

(4) One half of the fees and costs associated with Plaintiff's motion for sanctions.

Under the circumstances here, the Court finds that no other sanctions are warranted.[48]

Plaintiff is **DIRECTED** to meet and confer with the T & B Defendants no later than ten (10) days from the entry date of this Order to determine the value of these reasonable expenses. If the parties are unable to agree on this value, Plaintiff may file a sufficiently supported motion to enforce this sanction Order ("Motion to Enforce"), providing a detailed affidavit and

**45.** In addition, Defendants' entire course of conduct regarding the shareholder agreements created understandable mistrust on Plaintiff's counsel's part regarding other representation regarding the completeness of production.

**46.** Rules 37 and 26 both contemplate the imposition of sanctions upon the party failing to act, the attorney advising that party or both. *See* Fed.R.Civ.P. 37(d)(3); Fed.R.Civ.P. 26(g). The Court is not required to find that the T & B Defendants' counsel acted in bad faith before imposing sanctions. *See Devaney v. Continental Am. Ins. Co.,* 989 F.2d 1154, 1162 (11th Cir.1993).

**47.** The T & B Defendants and their counsel shall have no duty to pay the reasonable expenses directly associated with Plaintiff's preparation of the unsolicited "Notices" filed

in connection with the Court's *In Camera Review* of Documents (Docs. 71–72).

**48.** The T & B Defendants argue that because the Bankruptcy Court lacked subject matter jurisdiction, the Court cannot impose the severe sanctions of striking Defendants' answer or entering Defendants' default. As the Court is not imposing such sanctions it need not address this argument. Nonetheless, the Court is unaware of any authority that prevents the imposition of sanctions for violating the Bankruptcy Court's discovery order in this case. The case currently before the Court is a continuation of the adversary proceeding before Judge Bihary, the reference to whom was withdrawn after the parties filed a consent motion. That the Bankruptcy Court may have lacked subject matter jurisdiction does not change this determination.

accounting of the reasonable expenses incurred. Such motion must be filed no later than twenty (20) days from the entry date of this Order. The T & B Defendants shall respond within ten (10) days of being served. The Plaintiff may file a reply within five (5) days of service of the T & B Defendants' response.

### Summary of Rulings

For the foregoing reasons, the Court **ORDERS** as follows:

(1) The T & B Defendants' Motion to Withdraw Admissions [Doc. 112] is **GRANTED.**

(2) The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Omnibus Motion to Compel [Doc. 88].

 a. All Defendants are **DIRECTED** to produce all non-privileged documents responsive to each of Plaintiff's discovery requests and subpoenas as if each set of discovery requests and each subpoena were served on each Defendant. Defendants have a grace period of **fifteen (15) days** from the date of this Order to produce such documents, after which, the revelation or disclosure of such documents in any Defendants' possession will warrant sanctions.

 b. The Court finds that the crime-fraud exception applies to privileged communications between the T & B Defendants and their counsel regarding the transfer of goodwill from T & B (or the individual T & B Shareholders) and Habif. Thus, the Court **DIRECTS** the Defendants to produce, to the extent not already produced, all documents evidencing any communication with counsel on or before the execution of the Goodwill Contribution Agreements, relating to the transfer of goodwill from T & B (or the individual T & B Shareholders), regardless of any assertion of attorney-client privilege.

 c. The Court also finds that the Defendants have not met their burden to establish that the work product doctrine applies to documents created prior to August 25, 2009. Accordingly, the Defendants are **DIRECTED** to produce any document created prior to August 25, 2009, other than the CAMICO-related documents, (*see* T & B Privilege Log, Doc. 104–2 at 13–14 (Nos. 132, 135, 136,140–143, 145, 147, 150–156)), whose sole basis for protection is the work-product doctrine. (*See, e.g.,* Habif Privilege Log, Doc. 103–2 at 14–15 (Nos. 38, 39, 42).)

 d. The Court finds that the T & B Defendants did not waive the attorney-client privilege by communicating with Habif or Habif's counsel after Plaintiff indicated his intention to sue Habif because all the Defendants in this action share a strong interest in a coordinated defense strategy. Nor have the T & B Defendants waived the attorney-client privilege by discussing among themselves, prior to Plaintiff's assertion of a fraudulent transfer, the decision to transfer goodwill. The T & B Defendants do not appear to assert the common interest privilege as to any other communications.

 e. The Court declines Plaintiff's request for access to Defendants' computers for a forensic examination.

(3) The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Mo-

tion to Compel CAMICO's Production of Documents Responsive to Supboena [Doc. 89].

a. The T & B Defendants and CAMICO are **DIRECTED** to produce any document identified in their respective privilege logs created before August 25, 2009 whose sole basis for withholding is the work product doctrine.

b. Likewise, CAMICO is **DIRECTED** to produce to Plaintiff documents 1 and 9 on its privilege log (Doc. 98–1) as CAMICO failed to support its assertion of the common interest privilege regarding communications with T & B, P.C. or the individual T & B Shareholders.

c. The T & B Defendants and CAMICO have no other obligations to produce to Plaintiff the communications between them.

(4) The Court **GRANTS** Plaintiff's Motion to File Sanctions Brief in Excess of Page Limits [Doc. 119].

(5) The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Sanctions [Doc. 120]. The T & B Defendants and their counsel are **DIRECTED** to pay the reasonable expenses, including attorney's fees, in connection with the following:

a. Plaintiff's subpoenas to produce documents directed to (a) Bryan Cave, (b) Sutherland, and (c) Taylor English;

b. Plaintiff's responses to motions to quash these subpoenas;

c. Plaintiff's preparation and attendance at the December 7, 2012 and December 12, 2012 status conferences; and

d. One half of the fees and costs associated with Plaintiff's motion for sanctions.

(6) Plaintiff is **DIRECTED** to meet and confer with the T & B Defendants no later than ten (10) days from the entry date of this Order to determine the value of the reasonable expenses listed in number (5) above. If the parties are unable to agree on this value, Plaintiff may file a sufficiently supported motion to enforce this sanction Order ("Motion to Enforce"), providing a detailed affidavit and accounting of the reasonable expenses incurred. Such motion must be filed no later than twenty (20) days from the entry date of this Order. The T & B Defendants shall respond within ten (10) days of being served. The Plaintiff may file a reply within five (5) days of service of the T & B Defendants' response.

(7) A failure to comply with the directives in this Order may warrant more severe sanctions.

**IT IS SO ORDERED.**